**FRUEHAUF CORPORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 278, Docket 78–4053.**

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1978.

Decided June 28, 1979.

John R. Ferguson, Washington, D. C. (William H. Wentz, Phillip A. Proger, Janine H. Coward, Timothy F. Bannon, Pettit & Martin, Washington, D. C., Walter, Conston, Schurtman & Gumpel, P. C., New York City, of counsel), for petitioner.

D. Barry Morris, Atty., F. T. C., Washington, D. C. (Michael N. Sohn, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, W. Dennis Cross, Asst. Gen. Counsel, F. T. C., Washington, D. C., of counsel), for respondent.

Before MANSFIELD and OAKES, Circuit Judges, and BARTELS, District Judge.*

MANSFIELD, Circuit Judge:

Pursuant to 15 U.S.C. § 21 Fruehauf Corporation ("Fruehauf"), the nation's largest manufacturer of truck trailers, petitions to review and set aside a decision and order of the Federal Trade Commission ("FTC") finding that Fruehauf's 1973 acquisition of Kelsey-Hayes Company ("Kelsey"), a manufacturer of components for the motor vehicle and related industries, violated § 7 of the Clayton Act, 15 U.S.C. § 18,[1] and directing that Fruehauf divest itself of Kelsey's Auto Truck Group, the preponderant division of Kelsey, and that for 10 years Fruehauf not acquire, without prior FTC approval, any company engaged in manufacture, distribution, or sale of heavy duty wheels ("HDW"), truck trailers or heavy duty antiskid braking devices ("ASBD").[2]

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1.   "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. . . . ."

2.   Fruehauf also appeals the Commission's refusal to reopen consideration of its analysis of the impact of the merger on one of the relevant product markets in light of developments subsequent to the publication of its decision. 91 F.T.C. 1153 (1978). For reasons discussed within, see pp. 3489–3492, *infra*, we need not decide whether this refusal to reopen was improper and, if so, whether we could order the Commission to reopen the proceedings.

91 F.T.C. 132 (1978). For reasons set out below, we decline to enforce the divestiture order.

Both Fruehauf and Kelsey are based in Michigan, the former in Detroit and the latter in Romulus. In 1972 Fruehauf had truck trailer sales and rentals of $550 million and assets of $556 million. For the comparable period, Kelsey had net sales of its entire product line of $455 million and assets of $243 million. It is undisputed that the relevant geographic market is the United States and that the product markets in which it was found by the FTC that competition may be substantially lessened as a result of the merger are those for (1) heavy duty wheels (HDW), (2) antiskid brake devices (ASBD), and (3) truck trailers. Kelsey manufactures heavy duty wheels and antiskid brake devices. Both of these products (HDWs and ASBDs) are sold to manufacturers of trucks and tractors (e. g., Ford, International Harvester, General Motors, Rockwell, Chrysler, Caterpillar), as well as to manufacturers of trailers (e. g., Fruehauf, Trailmobile). Fruehauf manufactures trailers for sale to truck fleets such as P.I.E. and United Parcel Service.

*The Products*

(1) *HDW*

A heavy duty wheel or HDW is the assembly connecting the tire to the axle of a vehicle. It consists of a center member, a rim, and a brake drum, which components can be bought as an assembled unit or separately from different manufacturers. There are two different wheel assemblies in use, which are not interchangeable. One is the cast spoke wheel, which consists of a "spider" or cast steel spoke center member with an integral hub, a brake drum, and a detachable rim or rims. The other is the disc wheel assembly, which consists of a steel center member or disc with rim permanently attached (by welding), a hub, and a brake drum. A spider with two rims performs essentially the same function as two disc wheels (with attached rims) and a hub.

(2) *ASBD*

The antiskid brake device or ASBD is a supplement to an air brake system which is designed to prevent wheel lock-up, and thereby possible skidding, during emergency braking. This sophisticated device consists of a sensor, a computer or logic module and a valve. The sensor (one at each end of the axle) determines the speed at which the wheel is actually rotating. The computer or logic module calculates the speed at which the wheel should be turning in order to achieve maximum braking efficiency. The logic can determine when a wheel lock-up is impending, and, on signal from the computer or logic, the valve regulates the air pressure to release the brakes momentarily and so prevents lock-up. These components are ordinarily, but not necessarily, produced by the same manufacturer.

The ASBD was developed as the result of a regulation issued by the National Highway Traffic Safety Administration of the Department of Transportation (NHTSA), which is known as Federal Motor Vehicle Standard No. 121 (Standard 121), 49 C.F.R. § 571.121. Standard 121 sets forth performance standards for air-braked vehicles. It does not expressly require the use of ASBD, but experience proved that as applied to trucks Standard 121 could not be satisfied without the ASBD. See *Paccar, Inc. v. NHTSA*, 573 F.2d 632, 639, n.26 (9th Cir. 1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 172 (1979).

(3) *Trailers*

A truck trailer, of which thousands are seen on public highways, is a nonpowered vehicle, usually looking somewhat like a railroad box car on rubber-tired wheels, designed to be pulled by a power vehicle (truck tractor) and used for the purpose of transporting products over public highways. It consists essentially of a chassis or frame on wheels and a body attached to the frame. The principal purchasers of trailers are trucking fleets (such as United Parcel Service). Most fleets develop their own respective detailed specifications designating the components to be used in the manu-

facture of trailers to be used by them, which are then submitted to trailer manufacturers for bidding, rather than accept standardized designs or products made by any specific manufacturer.

*The Markets*

The ALJ and the Commission found that the Fruehauf-Kelsey merger might "substantially . . . lessen competition" in three product markets: the truck trailer market, the HDW market, and the ASBD market. In essence, they determined that the merger would impair competition in the trailer market by giving Fruehauf an advantage over other trailer manufacturers in obtaining a supply of HDWs, which have been subject to periodic shortages in the past. In the Commission's view the merger would also impair competition in the HDW and ASBD markets by foreclosing other competing manufacturers of these products from selling to Fruehauf and thus deterring expansion on the part of small existing competitors in these markets or the entry into these markets of new competitors.[3] See 91 F.T.C. at 228–29, 234–36. Fruehauf argues that the Commission's decision is factually erroneous, legally misguided, and economically groundless.

(1) *Trailer Market*

Before proceeding to Fruehauf's contentions, some pertinent information about the three relevant markets is essential. The total value of truck trailer shipments in the United States approximates $1 billion per year. In 1973 Fruehauf accounted for about 25% of the sales, with the top four firms accounting for about 49% of the truck trailer market and the top eight firms for 64%, respectively. Despite these figures there are scores of other firms engaged in trailer production. Moreover, these figures reflect a modest decline in the market

shares of the leading firms in the period from 1968 to 1973, a period during which the dollar volume of sales steadily increased, due in part to inflation, and the quality of trailers improved. 91 F.T.C. at 153–54. HDWs are essential components in the construction of truck trailers, as are ASBDs if Standard 121 is to be in effect.

(2) *ASBD Market*

In 1975 and 1976 seven ASBD manufacturers competed in the ASBD market, which had total sales in 1975 of about $40 million. Kelsey, the leading firm in the ASBD market, accounted for 32.5% of sales by unit, 28.6% by dollar volume. The two top firms accounted for over 50% of total ASBD sales by unit in 1975, and the top four accounted for about 75%. In 1975 Fruehauf purchased 5.4% of the ASBD market's unit volume, 4.7% of the dollar volume. *Id.* at 207. There is evidence that prior to the 1973 Fruehauf-Kelsey merger, which took place before Standard 121 went into effect, Fruehauf was not expected to obtain its ASBD requirements from Kelsey because Kelsey lacked an in-axle sensor design. In 1975, however, Fruehauf purchased 42% of its ASBD requirements from Kelsey. *Id.* at 150, 207.

The most critical information concerning the ASBD market, however, is not market shares or the costs of entry but the status of the government regulation which is the *raison d'etre* of this market. Standard 121 was first proposed in 1967 and, after several postponements and revisions, went into effect in early 1975.[4] The record evidence leaves little doubt that truck tractor and trailer buyers will not order ASBDs unless required to do so by the government. Representatives of the trucking industry have protested that available antiskid devices

---

**3.** The Commission reversed the finding of the ALJ that the merger violated § 7 by removing Fruehauf as a potential entrant in the HDW market. The Commission found insufficient evidence that Fruehauf was likely to enter this market. 91 F.T.C. at 238. The ALJ also ruled that the merger was illegal because it would entrench Fruehauf in the truck trailer market. The Commission determined that this theory

overlapped with the "captive supply" theory, and saw no reason to inquire into entrenchment as a separate basis for condemning the merger. 91 F.T.C. at 240.

**4.** The history of Standard 121 through April 1978 is recounted in considerable detail in *Paccar, Inc., supra,* 573 F.2d at 634–39.

used in order to comply with Standard 121 are so prone to malfunction that they create a greater hazard than the one they are intended to eliminate. See *Paccar, supra,* 573 F.2d at 637, 641–42.

In March 1978 NHTSA, bowing to this pressure, proposed a suspension of the "no lockup" requirement for truck trailers, 43 Fed.Reg. 9626 (March 9, 1978). If put into effect this suspension would remove the need for ASBDs. In the following month the Ninth Circuit enjoined enforcement of those parts of Standard 121 requiring installation of antilock devices (i. e., the stopping distance requirements for a vehicle traveling at 60 m.p.h.) until NHTSA had more persuasive evidence that the devices were reliable and effective. The court found that in light of the available evidence the standards necessitating installation of the devices were not "reasonable" and "practicable" as required by the enabling legislation. See 573 F.2d at 643; National Traffic and Motor Vehicle Safety Act of 1966, § 103(f), 15 U.S.C. § 1392(f). Following the decision in *Paccar,* NHTSA amended Standard 121 to exempt heavy-hauler trailers from the stopping distance requirements, 43 Fed.Reg. 58820, 58823 (Dec. 18, 1978).[5]

Neither the judicial nor the administrative action lifting the antilock requirements for truck trailers precludes the possibility that antiskid devices will be required in the future or that advancing technology will so lower the cost and improve the reliability of these devices that truck, tractor and trailer buyers will voluntarily instal them. At the present time, however, the evidence indicates that neither the ASBD market nor Fruehauf's purchases in that market are likely to be significant.

### (3) *The HDW Market*

The HDW market presents a different picture. Combined sales of cast spoke and disc wheels to manufacturers of trucks, tractors and trailers averaged about $210 million from 1970 through 1972. Kelsey was the fourth largest supplier during this period, accounting for about 15% of the market sales. The top four HDW producers together accounted for between 65% and 71% of the market during this period, while the top eight firms were responsible for 93% to 95% of the market. 91 F.T.C. at 202–203, 208. During this same period, Fruehauf purchased an average of 5.8% of total HDW production (3.3% as cast spokes).[6]

There is no significant difference between heavy duty wheels for trucks and trailers. Discs for these two vehicular units are identical. Cast spoke wheels differ only slightly, and they can be and are cast in the same foundry, with no more than an hour needed to change castings, and machined on the same lines.

Manufacture of disc and cast wheels does involve substantially different processes, however, and most firms which produce a center member specialize in one type or the other, i. e., cast spoke or disc. The center member of a cast spoke wheel is produced by pouring molten steel into a mold, allowing it to harden, and, after removal of the mold, treating and machining the spoke.[7] A disc center member is produced by cutting a disc from a steel sheet, spinning or stamping it into shape, and punching holes for the hub and for screws and bolts.[8] The rims for cast spoke and disc wheels are

5. The release containing these amendments to the regulation states that the exclusion for trailers is "temporary," although no termination date is provided. 43 Fed.Reg. at 58821. Recently, NHTSA announced its intent to study further the question of braking standards for trucks and trailers and solicited comments on a standard to replace Standard 121. 44 Fed.Reg. 9786 (Feb. 15, 1979).

6. The Commission's opinion uses the figure 3.9% for Fruehauf's share of cast wheel production, but this figure is in error, as the brief

for the Commission tacitly concedes. See FTC Br. at 18, n.10.

7. One firm, Erie Malleable Iron Co., produces cast iron spoke wheels, but in light of Erie's small share of the market, it is safe to assume that case iron wheels have limited appeal. See text at note 18, *infra.*

8. For the period 1970–72, the top eight firms (in descending order) in the HDW market, measured in dollar sales, and the type of wheel

similar and can be produced in the same facility with only a minor effort needed to shift from production of one to another. The brake drums for cast spoke and disc wheels are also substantially the same except for machining.

## DISCUSSION

■ A few general principles deserve mention at the outset. Upon review, the Commission's findings of fact, "if supported by substantial evidence, shall be conclusive," 15 U.S.C. § 21(c), and we may not substitute our inferences for those drawn by the Commission simply because we might have evaluated the facts differently as an original matter. See *FTC v. Pacific States Paper Trade Ass'n,* 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534 (1927); *Simeon Management Corp. v. FTC,* 579 F.2d 1137, 1142 (9th Cir. 1978). However, the Commission's findings must be supported by substantial evidence and there must also be a rational connection between those findings and its conclusions.

It is our function, therefore, to determine whether the Commission's findings are supported by substantial evidence, and, if so, whether its conclusions are rationally based and consistent with governing statutory norms. Here, appellant maintains that the Commission's evidence falls short of showing that the risk of anticompetitive effect posed by the merger satisfies the criteria for a § 7 violation.

■ Section 7 of the Clayton Act was intended to arrest a trade restraint or a substantial lessening of competition in its incipiency; it is not concerned with "certainties." *Brown Shoe Co. v. United States,* 370 U.S. 294, 317–18, 323, 82 S.Ct. 1502, 8

L.Ed.2d 510 (1962); *United States v. E. I. Du Pont de Nemours & Co.,* 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Requiring a plaintiff to prove that substantial lessening of competition is inevitable would thwart the express intent of Congress to nip anticompetitive practices in the bud before they blossom into a Sherman Act restraint of trade, see *Brown Shoe, supra,* 370 U.S. at 323, n.39, 82 S.Ct. 1502, and would run counter to Congress' view that neither the Commission nor the courts should be charged with possession of powers of prevision that no one else has achieved. Yet there must be "the reasonable probability" of a substantial impairment of competition to render a merger illegal under § 7. A "mere possibility" will not suffice. *Brown Shoe, supra,* 370 U.S. at 323, 82 S.Ct. 1502; *BOC International Ltd. v. FTC,* 557 F.2d 24, 28 (2d Cir. 1977); *Crown Zellerbach Corp. v. FTC,* 296 F.2d 800, 824–25 (9th Cir. 1961), *cert. denied,* 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962); *United States v. Atlantic Richfield Co.,* 297 F.Supp. 1061, 1066 (S.D.N.Y.1969), *aff'd sub nom. Bartlett v. United States,* 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971).

■ A vertical merger, unlike a horizontal one, does not eliminate a competing buyer or seller from the market, 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 527a, p. 376 (1978). It does not, therefore, automatically have an anticompetitive effect, R. Posner, *Antitrust Law, An Economic Perspective* 200 (1976), or reduce competition. Accordingly, a vertical merger, as distinguished from price-fixing boycotts, or similar arrangements between competitors, does not amount to a *per se* substantial lessening of competition, *Ash Grove Cement Co.,* 85 F.T.C. 1123, 1165 (1975), *affd.,* 577 F.2d 1368

---

they produce were: Firestone (disc), Dayton-Walther (cast), Kelsey-Hayes (principally cast), Budd (disc), Motor Wheel Division of Goodyear (disc), Rockwell, Webb Wheel Division of Marmon Industries (cast), and Reyco. Rockwell and Reyco do not produce center members.

Usually the purchaser of the truck or trailer specifies the type of wheel to be used, spoke or disc. Fleet operators generally standardize their fleets by adopting one or the other for exclusive use. For reasons not fully made

clear, truckers operating primarily west of the Mississippi, and particularly those operating on the West Coast, tend to use disc wheels, whereas cast spoke wheels predominate east of the Mississippi. Each type of wheel enjoys a number of relative advantages over the other, and cast spoke and disc producers compete vigorously with each other to convince fleet operators of the superiority of their respective products.

(9th Cir. 1978); *Marquette Cement Mfg. Co.,* 75 F.T.C. 32, 103–04 (1969). Indeed, it may even operate to increase competition, see Areeda, *Antitrust Analysis* ¶ 619, pp. 536–37 (1967).

■ As the Supreme Court recognized in *Brown Shoe, supra,* the fountainhead of § 7 analysis of vertical mergers, the competitive significance of a vertical merger results primarily from the degree, if any, to which it may increase barriers to entry into the market or reduce competition by (1) foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms, (2) by foreclosing competitors of the selling firm (in this case other HDW or ASBD manufacturers) from access to the market or a substantial portion of it, or (3) by forcing actual or potential competitors to enter or continue in the market only on a vertically integrated basis because of advantages unrelated to economies attributable solely to integration. See 370 U.S. at 328, 82 S.Ct. 1502. The ultimate objective, however, is to determine whether and how

the particular merger in issue may lessen competition, i. e., what its anticompetitive effect on the market, if any, is likely to be.

Although it has been suggested that a significant percentage of market foreclosure, standing alone, might constitute a sufficient "clog on competition" to amount to a violation of § 7 without more, *Standard Oil Co. of Calif. v. United States,* 337 U.S. 293, 314, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), no such *per se* rule has been adopted, except where the share of the market foreclosed reaches monopoly proportions.[9] See *Brown Shoe, supra,* 370 U.S. at 328, 82 S.Ct. 1502. The Supreme Court's insistence that each merger challenged under § 7 be "viewed . . . in the context of its particular industry," *Brown Shoe, supra,* 370 U.S. at 321–22, 82 S.Ct. at 1522; *United States v. General Dynamics Corp.,* 415 U.S. 486, 498, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), and that the Clayton Act protects "*competition, not competitors,*" 370 U.S. at 320, 82 S.Ct. 1502 (emphasis in original), contravenes the notion that a significant level of foreclosure is itself the proscribed effect. See *FTC v.*

9. In a literal sense, any vertical foreclosure represents a lessening of competition inasmuch as the foreclosed transactions are removed from the arena of competition. A "substantial" lessening of competition might then be a foreclosure of a numerically significant percentage of the market. At times *Brown Shoe* appears to encourage this simplified analysis. See 370 U.S. at 323–24, 82 S.Ct. 1523: "The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition,' *Standard Oil Co. of California v. United States,* 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371 [1949], which 'deprive[s] . . . rivals of a fair opportunity to compete.' H.R. Rep. No. 1191, 81st Cong., 1st Sess. 8" (footnote omitted). *Du Pont, supra,* also lends support to this view where both the market affected and the degree of foreclosure are substantial. 353 U.S. at 595, 77 S.Ct. 872; see also *id.* at 607, 77 S.Ct. at 884 ("The statutory policy of fostering free competition is obviously furthered when no supplier has an advantage over his competitors from an acquisition of his customer's stock likely to have the effects condemned by the statute.") Of course, in *Du Pont* the size of the companies and of the percentage of foreclosure in the market as defined by the Court left no doubt

that the vertical tie conferred market power upon *Du Pont.*

But we are unwilling to assume that any vertical foreclosure lessens competition. Absent very high market concentration or some other factor threatening a tangible anticompetitive effect, a vertical merger may simply realign sales patterns, for insofar as the merger forecloses some of the market from the merging firms' competitors, it may simply free up that much of the market, in which the merging firm's competitors and the merged firm formerly transacted, for new transactions between the merged firm's competitors and the merging firm's competitors. See 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 527a (1978).

A similar issue arises under § 3 of the Clayton Act, 15 U.S.C. § 14, governing exclusive dealing contracts, including requirements contracts, which present much the same evil as a vertical merger foreclosing a portion of the supplying firm's market. See *Standard Oil, supra,* where the Court found that a requirements contract violated § 3 because of the percentage of the market foreclosed, 337 U.S. at 314, 69 S.Ct. 1051. The Court observed that use of such exclusive dealing arrangements by Standard and its major competitors enabled them to maintain oligopolistic control of the market. *Id.* at 295, 309, 69 S.Ct. 1051.

*Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967) ("Section 7 of the Clayton Act was intended to arrest the anticompetitive *effects* of market power in their incipiency") (emphasis added). A showing of some probable anticompetitive impact is still essential (e. g., promotion of a trend toward integration; reduction in number of potential market competitors; entrenchment of a large supplier or purchaser; increase in barriers to entry).[10] Instead of a *per se* approach, *Brown Shoe* mandates that when a merger is challenged under § 7 it "becomes necessary to undertake an examination of various economic and historical factors in order to determine whether the arrangement under review is the type Congress sought to proscribe." 370 U.S. at 329, 82 S.Ct. at 1526.

■ In *Brown Shoe* the Court described some of the factors to be considered in "predicting the probable future conduct of the parties and thus the probable effects of the merger." Most important among the factors are the nature and economic purpose of the arrangement, the likelihood and size of any market foreclosure, the extent of concentration of sellers and buyers in the industry, the capital cost required to enter the market, the market share needed by a buyer or seller to achieve a profitable level of production (sometimes referred to as "scale economy"), the existence of a trend toward vertical concentration or oligopoly in the industry, and whether the merger will eliminate potential competition by one of the merging parties. To these factors may be added the degree of market power that would be possessed by the merged enterprise and the number and strength of competing suppliers and purchasers, which might indicate whether the merger would increase the risk that prices or terms would cease to be competitive. This list, with some variations, has been the standard framework for analysis of the legality of a vertical merger. See, e. g., *Mississippi River Corp. v. FTC,* 454 F.2d 1083, 1091–93 (8th Cir. 1972); *ITT v. GTE,* 449 F.Supp. 1158, 1177–78 (D.Hawaii 1978). Application of these factors may reveal that a vertical merger poses no threat to competition at all, resulting merely in a realignment of sales as a result of "in-house" transactions within the merged enterprise but leaving the number of competing sellers and their market shares unchanged, or that it poses a threatened lessening of competition that may be *de minimis,* may be of monopoly proportions, or may lie somewhere in between the two, 370 U.S. at 328–29, 82 S.Ct. 1502.

■ As the Supreme Court made clear in *Brown Shoe,* there are no precise formulas for determining whether a vertical merger may probably lessen competition. Rather, the objective of discerning what, if any, anticompetitive effects the merger may have can be achieved only by examining the foregoing market factors as they exist for the particular merger in issue. It is true that the Department of Justice has for many years issued "Merger Guidelines" for the purpose of indicating to the business community, legal profession and the public generally when the Department may question the legality of a merger. See U.S. Dept. of Justice Merger Guidelines, 1 Trade Reg. Rep. (CCH) ¶ 4510.[11] But just as these guidelines do not preclude governmental challenge to a merger which does not fall within all the terms of the guidelines, see *Atlantic Richfield, supra,* 297 F.Supp. at 1073, so the guidelines do not establish the illegality of a merger which does fit the criteria used by the Justice Department in deciding whether to challenge a merger. The guidelines, therefore, simply reflect the

10. See text at notes 23 to 27, *infra,* and cases cited therein.

11. The Guidelines state that the Department may be expected to challenge "a merger or series of mergers between a supplying firm, accounting for approximately 10% or more of the sales in its market, and one or more purchasing firms, accounting *in toto* for approximately 6% or more of the total purchases in that market, unless it clearly appears that there are no significant barriers to entry into the business of the purchasing firm or firms." Guidelines ¶ 12, *supra,* p. 6886.

considered view of the Justice Department as to which mergers are most likely to create a reasonable probability of substantially lessening competition and which may therefore warrant the institution of legal action. See Guidelines ¶ 1, *supra,* at 6882. Accordingly, whether or not the degree of market concentration, the height of entry barriers, the size of the merging firms, and the extent of foreclosure match or exceed the benchmarks incorporated into the Justice Department's guidelines, the Commission still bears the burden of showing the likelihood that the future effect of "*that* merger [of Kelsey and Fruehauf] may be substantially to lessen competition." *Brown Shoe, supra,* 370 U.S. at 332, 82 S.Ct. at 1527–1528 (emphasis in original).

With these basic principles in mind we proceed to review the Commission's findings and conclusions with respect to the Fruehauf-Kelsey merger.

### I. The Truck Trailer Market

■ The Commission concluded that the merger violated § 7 with respect to the truck trailer market solely on the theory that in the event of a shortage of HDWs Kelsey would give Fruehauf a substantial competitive advantage over other trailer manufacturers by diverting to Fruehauf wheels that would otherwise go to Kelsey's other customers, some of which are trailer manufacturers.[12] 91 F.T.C. at 235–36. This conclusion rests upon several assumptions, having no appreciable evidentiary support. One assumption is that Kelsey is a significant and substantial supplier of HDWs to Fruehauf's competitors. The rec-

ord reveals that, on the contrary, trailer manufacturers have in the past purchased almost all of their HDWs from other suppliers, with Kelsey's sales of wheels to trailer manufacturers other than Fruehauf amounting to approximately $1.4 million per year out of total average annual HDW market sales amounting to $200 million per year during the three-year period prior to the merger. In the years 1970–72, sales to trailer manufacturers, including Fruehauf, accounted for only about 7% of Kelsey's HDW output. Thus Kelsey, while a large manufacturer of HDWs, has hardly been a substantial supplier of HDWs to trailer manufacturers.

The second unsupported assumption is that Kelsey would, in the event of an HDW shortage, divert to Fruehauf HDW sales that would otherwise be made to other customers. There is no evidence, and it is not alleged, that Fruehauf contemplated such a stratagem when it entered the merger with Kelsey.[13] More important, there is no credible evidence that another shortage is reasonably foreseeable. Even if it were, the evidence that Kelsey would give priority to Fruehauf's needs is insubstantial. As to the likelihood of a shortage, the record indicates that the combined capacity of wheel producers was considerably expanded after the 1973–74 shortage and that, even when conservatively estimated, this capacity exceeds a liberal estimate of anticipated demand during the next five or ten years.[14]

During past shortages Kelsey, like other wheel producers, has allocated its production *pro rata* among its customers in accord-

12. Fruehauf would enjoy an unfair advantage over its competitors if Kelsey diverted sales to Fruehauf from customers who do not build trailers, but the relative advantage would not be as great. Moreover, Kelsey's non-trailer customers, including Ford and General Motors, exercise the greatest leverage over Kelsey with the threat of retaliatory withdrawal of patronage.

13. Appellant contends that the merger came about through the initiative of Kelsey, which turned to Fruehauf in order to forestall a takeover by a less desired suitor. A witness for appellant who participated in the merger negotiations testified that the subject of vertical

dealings was never broached in the meetings between Kelsey and Fruehauf. Whatever specific topics were discussed by the negotiators, we tend to doubt that the parties, in concluding that they would be compatible merger-partners, failed to take into account possible vertical transactions between them, even though nothing may have been said on the subject.

14. The last shortage, in 1973–74, was not foreseen. A witness from Dayton-Walther suggested that this shortage was due in part to a heavier than expected stampede of truckers rushing to buy trucks and trailers before Standard 121 went into effect.

ance with their regular volume of purchases. Appellant insists that Kelsey will follow this precedent in the future, notwithstanding Fruehauf's ownership of the company. The Commission cites no evidence shedding doubt upon this representation. On the contrary a spokesman from Trailmobile Corp., Fruehauf's largest competitor, testified that his company believed that the merger would not affect Kelsey's policy in favor of *pro rata* distribution in the event of a shortage.

One might reasonably question the weight to be given to appellant's self-serving assurances that Kelsey would allocate *pro rata* if the need arose, as well as the significance of Kelsey's *pro rata* distribution of wheels during the 1973–74 shortage, which took place after the merger but at a time when appellant could have anticipated a challenge to its legality. However Kelsey's policy in favor of *pro rata* allocation need not rest upon some philosophical commitment to egalitarianism since it could also make sound business sense. If Kelsey deprived its regular customers of a proportionate share of HDWs in times of shortage it would risk their retaliating by shifting to competing suppliers not only their purchases of HDWs but of other products presently bought from Kelsey, which could cause it greater economic harm. In addition, by granting priority to Fruehauf over other trailer manufacturers who purchase wheels from Kelsey, Kelsey would invite antitrust damage actions against it by these trailer firms. Under the circumstances, it appears highly unlikely that Kelsey would take such risks.

Thus the Commission's finding that the merger violates § 7 with respect to the truck trailer market is based on speculation rather than fact. It assumes in the face of contrary evidence that a shortage will recur in the reasonably proximate future. Upon

this unsupported basis it infers that in the event of a shortage Kelsey would give priority to Fruehauf to the detriment of its competitors. Although neither of these assumptions is by any means beyond the realm of the possible, here they run counter to the actual evidence in the record. We cannot therefore say that they add up to a reasonable probability that the merger will substantially lessen competition. Accordingly, the finding of a § 7 violation based upon the effect of the merger on the truck trailer market must be set aside as unsupported by substantial evidence.

II. *The ASBD Market*

■ We need not consider appellant's contention that the Commission's conclusions regarding the barriers to entry into the ASBD market are erroneous, or that the uncertain status of the market at the time when the Commission issued its decision precluded a finding that the merger would have a substantial anticompetitive effect on the ASBD market.[15] Intervening events, specifically the Ninth Circuit's decision in *Paccar, Inc., supra,* on April 17, 1978, invalidating Standard 121, the Supreme Court's denial of certiorari on October 2, 1978, and the NHTSA's decision on December 18, 1978, to modify the Standard, render unsupportable the Commission's earlier conclusions with respect to the ASBD market.

The record unmistakably reveals that truck operators will not equip their vehicles with antiskid devices in the absence of a legal obligation to do so. Since trailers are now officially excluded from the antiskid requirements, Fruehauf is unlikely to purchase a significant volume of antiskid devices and we see little logic in affirming an order holding that the merger creates a reasonable probability of a substantial lessening of competition in the market if not

**15.** The Commission issued the final order on February 22, 1978, and denied the petition to reopen the order on June 22, 1978. *Paccar, supra,* was decided on April 17, 1978, and certiorari was denied on October 2, 1978. The Commission denied Fruehauf's motion to reopen the order on the grounds that the possibility remained that NHTSA would reimpose the

same or similar performance standards for air-braked vehicles, or that Fruehauf would remain a substantial purchaser of ASBD even if it had no legal obligation to instal the device, and that reversal of the finding of a violation with respect to the ASBD market would not in any event alter the scope of the divestiture order. 91 F.T.C. at 1153–55.

only Fruehauf's share but the market itself appears to have been stripped of any significance. The burden is now on the Commission to demonstrate that notwithstanding these basic decisions the merger may have a significant effect on the market. In the meantime the Commission's conclusions with respect to the ASBD market must be set aside, without prejudice to its right to renew its proceeding if future developments should prove that the predicted demise of the ASBD market is greatly exaggerated.

We are aware of the need for repose in administrative adjudications and, more to the point, of the Supreme Court's repeated declarations that the decision whether to reopen an administrative proceeding is within the complete discretion of the agency and will not be reversed except perhaps when an agency adheres to a decision in the face of an epochal change in conditions.[16] The necessarily protracted nature of most agency proceedings makes it inevitable that some of the evidence taken will be obsolete by the time a decision is rendered. Here, however, appellant is not merely claiming that the record is inadequate to support the agency's conclusions. Rather, it is claimed that the record affirmatively demonstrates that these conclusions are erroneous.[17]

Although the NHTSA has not yet definitely proposed to reimpose the ASBD requirement, see 44 Fed.Reg. 9783 (Feb. 15, 1979), the Commission maintains that there is a possibility of a substantial ASBD market in the future. But this possibility is not enough to sustain a conclusion that there is at present a reasonable probability that the merger will substantially restrain competition in this market. Accordingly, we need not determine whether the Commission abused its discretion in denying the petition to reopen the proceeding and, if so, whether it would be appropriate for this court to reverse that denial.

### III. *The HDW Market*

In determining whether Fruehauf's acquisition of Kelsey may substantially lessen competition in the HDW market the Commission stated:

> "In sum, no matter what the extent of barriers to entry into a highly concentrated industry, a merger between a major customer and a major supplier may restrain competition in the market for the *supplier's product* (in the case before us ASBD and heavy-duty wheels) by foreclosing competitors of the supplier from the possible patronage of the customer. . . ." 91 F.T.C. at 221 (emphasis in original).

■ Appellant contends that this statement amounted to the adoption by the Commission of a *per se* rule for economic analysis of a vertical merger in lieu of the more flexible standard adopted by the Supreme Court in *Brown Shoe* and that the Commission thereby ran afoul of the Supreme Court's disapproval of *per se* rules with respect to the legality of mergers, see, e. g., *United States v. Marine Bancorpora-*

16. See *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 294–96, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *ICC v. Jersey City,* 322 U.S. 503, 514–15, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). In the one case in which the Supreme Court reversed an agency's refusal to reopen a hearing to consider changed economic circumstances, *Atchison, T. & S. F. Ry. Co. v. United States,* 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932), the Court observed that a record closed in September, 1928, was not "representative" of conditions prevailing in 1931, when the Commission's order went into effect. *Id.* at 260–61, 52 S.Ct. 146. A recent decision of this court, *Greene County Planning Bd. v. FPC,* 559 F.2d 1227, 1233 (2d Cir. 1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), follows the *Jersey City* standard although it phrases it differently.

17. See *United States v. Aluminum Co. of America,* 148 F.2d 416, 445–46 (2d Cir. 1945) ("There is no reason why an appellate court . . . should not advise itself from outside the record of such facts as appear to admit of no genuine dispute," although evidence taken from outside the record cannot be regarded as conclusive). The instant case could be distinguished from those in which the rule of complete agency discretion is usually invoked inasmuch as this case does not involve a rate-making or permit-application procedure, where the agency is solely responsible for the substantive decision, but the application of a statute jointly administered by the Commission and the courts.

*tion, Inc.,* 418 U.S. 602 at 623, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). We disagree.

Although the Commission's quoted statement could conceivably be construed as automatically condemning a merger of the type described by it, we view it as merely expressing the Commission's view that the absence of a high entry barrier does not necessarily insulate a merger from challenge under § 7. High entry barriers may be a signal that a particular merger carries a potential for impairing competition but we agree with the Commission that barriers need not reach some predetermined level before an anticompetitive effect becomes possible. The issue, therefore, is whether the Commission's conclusions are consistent with a rational analysis and appraisal of the relevant market facts before it.

Appellant next contends that the Commission's conclusion that the merger will probably have an anticompetitive impact lacks economic or factual support, and is based on rank speculation. This again necessitates a study of whether the Commission's conclusions are consistent with a rational analysis and appraisal of the relevant facts before it, viewed in the light most favorable to the Commission.

We accept at the outset the Commission's findings that the HDW market is significantly concentrated, based on evidence that the top four producers account for 65–71% of the market, the top eight for 93–95%, and Kelsey, the third largest producer, 15%. Moreover, the Commission's determination that barriers to entry into HDW production are substantial is supported by evidence that the initial capital outlay required to enter production at an efficient level is $10–$20 million. 91 F.T.C. at 233. Appellant insists that barriers are "low" to "moderate," according to Professor Bain's celebrated scale, and that firms in the market cannot therefore have appreciable market power. We agree with the Commission that the matter should not turn on labels given to capital outlay requirements. We

also reject appellant's contention that in measuring the size of entry barriers the Commission ignored a class of industrial titans already possessing highly automated foundry equipment that would require relatively little additional capital investment to achieve production capability (e. g., General Motors, Ford, International Harvester, Rockwell and Chrysler). The record reveals that these organizations could not enter the market as easily as appellant argues and thus deter those in it from pursuing anticompetitive practice because they (General Motors, Ford, et al.) are equipped only to cast ductile iron, whereas all but a small proportion of cast spoke wheels sold in the market are composed of steel, which requires a different type of foundry facility than that possessed by them.[18] The Commission adopted the ALJ's finding that steel spokes are preferred to iron spokes, see 91 F.T.C. at 183, 233, n.26. Although the record apparently does not contain direct evidence corroborating this finding, the existence of this preference is inferable from the facts that iron spokes now command only a minor share of the market and that a number of iron foundries producing HDW components cast in ductile iron (e.g., hubs and drums), including International Harvester, have not expanded into production of spokes.

The Commission further determined that an HDW manufacturer could not achieve full scale economy unless its production volume was no less than about 8.9% of the total HDW market and assumed that a new entrant in this market could not pose effective competition unless it produced at this level and achieved scale efficiencies. We agree with Fruehauf's contention that the figure used and the assumption are at least partially in error. The Commission derived the 8.9% figure from testimony of Fruehauf's engineering expert, Mr. Joseph Greenberg, whose calculations showed that per unit cost of production declined as annual production increased to about 300,000

18. One firm, Erie, produces cast iron spiders, but its sales account for less than 3% of the market for cast wheels.

units of center members and drums [19] (300,000 is about 8.9% of the HDW market). In making these calculations, however, Greenberg presupposed that the wheel components were the *only* items produced on the hypothesized foundry and machining lines. Appellant points out that this engineering estimate did not provide a correct basis for determining scale economies, since a foundry and machine shop can with little difficulty shift production from one article to another, within certain weight and size limitations, so that the facilities could be operating at the most efficient level without necessarily producing a full complement of wheels.

Notwithstanding these errors in the Commission's analysis, evidence marshalled by the ALJ indicates that initial capital costs would exceed 10 million even for a production level substantially below 300,000 units. There is, therefore, substantial evidence, albeit not uncontroverted, supporting the Commission's conclusion that the capital cost barrier is substantial and significant, whatever the minimum level of efficient production might be.[20] For this reason we

do not reject the Commission's decision on this issue.[21]

■ The Commission further concluded that the amount of market foreclosure likely to result from the merger would range from "a weak 3.9" [actually 3.3%] to a "strong 5.8" of the market production of HDWs, depending upon whether one limits the calculation of Fruehauf's purchases of cast spoke HDWs, which are made by Kelsey and accounted for 3.3% of the market during the three-year premerger period, or also includes Fruehauf's purchases of heavy duty disc wheels, not presently manufactured by Kelsey, which accounted for 2.5% of the total HDW market during the same period. Since Kelsey does make discs for light-weight trucks and could produce heavy duty discs, the Commission was entitled to infer that Fruehauf, with its tradition of in-house purchasing, could expand Kelsey's disc wheel facilities to furnish at least the major part of Fruehauf's disc needs except possibly for nonintegral hubs.[22] However, there is no evidence that competing purchasers of these products would be foreclosed from continuing to ob-

19. The ALJ did not establish a precise figure for the volume associated with maximum scale efficiencies, but suggested that the figure would be about 5–10% of the market. 91 F.T.C. at 187.

20. Evidently, the ALJ did not consider the feasibility of entry into the HDW market with production only of center members, which could be sold as an individual component or as an assembled unit with components purchased from other manufacturers. Greenberg's study indicates that under the most likely circumstances of entry, a firm could launch into production of cast spokes at a volume of 200,000–300,000 at an initial cost of about $8–10 million.

21. The evidence on the barriers to entry into the HDW market via production of steel discs is meager in comparison to that for cast spokes. See 91 F.T.C. at 185 (¶ 222). What evidence there is suggests that the cost is less for discs. On the other hand, appellant does not argue that because of the relative ease of entry via disc production the HDW producers are wide open to potential competition.

22. The ALJ and the Commission found that Fruehauf traditionally purchases in-house whenever possible, even when the immediate

commercial interest would seem to dictate obtaining supplies aliunde. 91 F.T.C. at 204, 235. Prior to the merger Fruehauf's principal supplier of cast spoke wheels was the Dayton-Walther Co. Shortly after the merger took place Fruehauf granted Dayton a five-year, renewable contract for the purchase of wheels in response to Dayton's inquiries about the impact of the merger on its relationship with Fruehauf. A spokesman from Dayton testified that the contract gives it the option of continuing to supply Fruehauf as long as it offers wheels at a competitive price, although the witness was not unreservedly confident that the contract could be enforced. This witness also testified that loss of Fruehauf's business would not have a "drastic" effect on the company.

At least through the trial, Fruehauf continued to purchase wheels from Dayton but, subject to Dayton's rights under the contract, we agree with the Commission's observation that conduct while litigation is predictable or pending is no sure guide to a merging company's ultimate intentions. 91 F.T.C. at 236, n.29. Fruehauf does not contend that it does not expect to have Kelsey supply all the cast spoke wheels it needs.

tain all or part of their cast spoke needs from Kelsey or its competitors at competitive prices. Nor was there proof that removal from the market of up to 5.8% of its HDW sales would preclude any existing competitor from continuing to operate economically or any potential competitor from entering the market.

The Commission further found that there had been periodic HDW shortages within the 12 years prior to the merger (i.e., in 1966, 1968–69, 1973–74) and that, although Fruehauf was not itself a potential competitor in the production of HDWs prior to the merger, it had engaged in certain pro-competitive activities, consisting of experiments with new types of fabricated aluminum and steel wheels and encouragement of one foundry, McConway and Torley, to produce cast spoke wheels.

■ From the foregoing the Commission concluded that the merger

"runs afoul of Section 7 by foreclosing Fruehauf as a source of patronage of heavy duty wheels in a market setting in which such foreclosure is likely to increase barriers to entry, make new entry more difficult and less likely, and thereby enhance the market power conferred by a highly concentrated market structure into which entry was previously difficult to begin with. Additionally we believe that the merger is likely to lessen competition substantially by foreclosing Kelsey-Hayes as a source of supply to truck trailer manufacturers should shortages of supply recur." 91 F.T.C. at 236.

With due respect for the Commission's expertise, we fail to find any logical basis in the evidence for this conclusion, even when the record is viewed most favorably to the Commission. Not only is the conclusion a *non sequitur* but it flies in the face of undisputed contrary evidence.

There is no evidence in the record that existing barriers to entry into the HDW market or the existing concentration of producers in it, both admittedly substantial, have been or would be increased by the merger. There is no reason to believe that the merger will adversely affect scale economies for HDW production, thereby increasing the cost of entry. Nor does the Commission suggest that as a result of the merger a firm could successfully enter the HDW or the trailer market only by simultaneously entering at both levels. As to the effect of the merger on the concentration of the HDW industry, since Fruehauf's principal supplier of spoke wheels has been Dayton-Walther, the largest producers of spokes and second largest wheel producer, any shifting of patronage from Dayton to Kelsey will tend to even out the market shares of the three largest sellers of HDWs, but not increase their aggregate market share. The ALJ expressly refused to find that the merger would entrench Kelsey as a producer, stating "I cannot conclude that Kelsey-Hayes has been 'entrenched' as that term has heretofore been used in Section 7 cases."

Moreover, there is no allegation that the merger of Fruehauf and Kelsey is part of an existing or prospective trend toward vertical integration, such as existed in *Brown Shoe, supra,* and in other cases.[23] There is no suggestion, much less evidence, that the merger was motivated by a desire to restrain competition.[24] On the contrary, the evidence is undisputed that Kelsey, whose stock was selling substantially below book value, sought out Fruehauf in order to avoid takeover efforts on the part of others. Nor is there any evidence that the merger might impair competition by conferring upon one of the merging partners a "deep pocket" or financial clout not enjoyed by its

---

**23.** See *Brown Shoe, supra,* 370 U.S. at 332–33, 334, 82 S.Ct. 1502; *United States Steel Corp. v. FTC,* 426 F.2d 592, 603 (6th Cir. 1970); *United States v. Ford Motor Co.,* 315 F.Supp. 372, 375 (E.D.Mich.1970), *aff'd,* 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972); *United States v. Kennecott Copper Corp.,* 231 F.Supp. 95, 103–

05 (S.D.N.Y.1964), *aff'd per curiam,* 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965); *Ash Grove Cement Co.,* 85 F.T.C. 1123, 1165–66 (1975), *aff'd,* 577 F.2d 1368 (9th Cir. 1978).

**24.** See text at note 12, *supra.*

rivals.[25] It is true that some market fore-closure may ensue from the merger, but not one that deprives rivals from major channels of distribution,[26] much less one that excludes them from the market altogether.[27] Even if Fruehauf were to switch its purchase of its entire HDW wheel needs, amounting to 5.8% of the market, from others to Kelsey (which would require Kelsey to enter heavy duty disc production), there would merely be a realignment of existing market sales without any likelihood of a diminution in competition.

The only theory suggested by the Commission as to how the merger might impair competition in the HDW market is that, assuming Kelsey supplied all of Fruehauf's HDW needs, amounting to 5.8% of the market or slightly less than the minimum Department of Justice Guideline figure, this

foreclosure would be sufficient alone in such a setting to significantly lessen the likelihood that a new firm would enter this market or, what amounts to the same thing for our purposes,[28] to lessen the chance that an existing small competitor would substantially increase its capacity and compete on a wider scale. According to the Commission, although it found that Fruehauf itself was not a potential entrant into the HDW market,[29] Fruehauf had a pro-competitive effect on the market through its collaborative efforts to develop new types of heavy duty wheels and by virtue of its ability to draw new entrants into production of conventional wheels by offering to deliver its patronage.[30]

In light of the record evidence, this theory is too ephemeral to sustain the Commission's decision.[31] Although Fruehauf did

**25.** See *United States Steel Corp.*, supra, 426 F.2d at 603–04; *Reynolds Metal Co. v. FTC*, 114 U.S.App.D.C. 2, 8–9, 309 F.2d 223, 229–30 (1962); *United States v. Kimberly-Clark Corp.*, 264 F.Supp. 439, 461 (N.D.Calif.1967); *Kennecott Copper*, supra, 231 F.Supp. at 104.

**26.** See *Kimberly-Clark*, supra, 264 F.Supp. at 461.

**27.** See *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 982 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *ITT*, supra, 449 F.Supp. at 1181–82.

**28.** See *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 530, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973).

**29.** See *Ford*, supra, 315 F.Supp. at 375; *United States v. Standard Oil Co. (New Jersey)*, 253 F.Supp. 196, 227 (D.N.J.1966).

**30.** In the late 1960's and early 1970's Fruehauf experimented with a fabricated aluminum wheel and a fabricated steel wheel for production in Fruehauf's own facilities. Fruehauf abandoned the steel wheel project in early 1970 in order to concentrate its efforts on the aluminum wheel, which seemed more promising. This project was abandoned in 1971 when Fruehauf determined that under existing market conditions production of fabricated aluminum wheels was not economically feasible. Following the termination of these efforts to develop a wheel for in-house production, Fruehauf explored with U.S. Steel the development of a fabricated steel wheel to be designed by an outside engineering firm and produced by U.S. Steel. The prototype turned out to be unac-

ceptable for commercial use, and the project ended in September 1973.

In 1967–68, when a strike halted wheel production at Dayton-Walther, the leading producer of cast spoke wheels and Fruehauf's traditional principal supplier, Fruehauf favorably responded to an inquiry from McConway and Torley, a leading producer of cast steel components used by the railroad industry, about the possibility of it producing wheels for Fruehauf. Eager to cultivate an alternate source of supply, Fruehauf provided McConway with necessary drawings and helped finance the purchase of patterns and equipment. For a few years, McConway sold cast spokes to Fruehauf. Fruehauf stopped buying from McConway in late 1973, and shortly thereafter McConway, which had experienced greater than anticipated production problems, exited from the market. According to testimony of a spokesman from McConway, when the demand for the company's railroad products revived, and when Dayton resumed production of wheels, McConway figured that it had overestimated the need for a new wheel producer and so decided to concentrate on its traditional product lines.

In the late 1960's Fruehauf, at the initiative of Webb Wheel, held preliminary discussions about an arrangement whereby Webb would supply Fruehauf's cast spoke requirements. These discussions terminated at an early stage, however, because of a lack of interest on the part of Webb's senior executives.

**31.** The Commission has recognized that the "test for finding injury due to elimination of a potential competitor is not simple." It cannot rest on concentration ratios alone. "Additional factors enter into any analysis of the loss of a

experiment in the development of new kinds of wheels and assisted one foundry in temporary production of HDWs, both adventures proved to be complete failures and there is no evidence that, if the merger were disapproved, Fruehauf would engage in similar activities. Moreover, the Commission has presented no evidence suggesting that Fruehauf was unique in its ability to elicit new competition, and there is no reason to believe that other firms patronizing the HDW market, particularly the automotive and trucking giants, will not encourage firms in the wings to enter that market, should they be dissatisfied with the quality of the existing competition.[32]

For the foregoing reasons enforcement of the Commission's order with respect to the truck trailer and HDW markets is denied. As for the alleged probability of a substantial lessening of competition in the ASBD market, we would ordinarily remand the proceeding to the Commission for reopening and reconsideration in light of the Ninth Circuit's decision in *Paccar, Inc., supra,* invalidating Standard 121, the Supreme Court's denial of certiorari in that case, and the NHTSA's later decision to modify the Standard. However, since the Commission, with these developments before it, on June 22, 1978, denied Fruehauf's petition to reopen the order, 91 F.T.C. at

1153–55, we feel compelled also to deny enforcement with respect to the ASBD market, without prejudice to the Commission's right either to seek modification of our order to permit reopening or to institute a new proceeding upon a showing that ASBD market conditions have changed in a way that provide a basis for concluding that the merger would threaten a substantial lessening of competition in that market.

---

potential competitor. Among these are: trends toward concentration in the market; extensive entry barriers; high probability that the lost potential competitor would have actually entered the market; whether the lost potential competitor was one of only a few such potential competitors and whether, if he had entered the market, his new competition would have had a significant impact on price and quality." *Beatrice Foods Co.,* 81 FTC 481, 526–27 (1972).

32. The Commission does not specify whether it proceeded under the theory that Fruehauf, at the time of the merger, exerted a present pro-competitive effect because HDW producers knew that Fruehauf was seeking to attract new sources of supply or would do so if prices rose to an unacceptable level, and conducted themselves accordingly, or under the theory that Fruehauf represented a potential pro-competitive effect through its ability to draw a new competitor into the market at some future time, and thereby strengthen competition at some future time.

The theory of perceived potential competition received the Supreme Court's imprimatur in *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 581, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). The validity of the theory of actual potential competition that has been reserved twice by the Supreme Court, *United States v. Marine Bancorporation,* 418 U.S. 602, 639, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 537, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), once by this court, *BOC International Ltd. v. FTC,* 557 F.2d 24, 25 (2d Cir. 1977), and by at least one other circuit court, *FTC v. Atlantic Richfield Co.,* 549 F.2d 289, 294 (4th Cir. 1977). Here the evidence is inadequate to sustain either of these theories. Ordinarily, these theories are applied when one of the merging firm is the potential entrant, but they conceivably could apply, assuming the necessary factual predicates, when the merging firm is not itself a potential competitor but a potential promotor of a third-party entrant.