**UNITED STATES of America, Plaintiff,**

**v.**

**LOEW'S INCORPORATED, et al., Defendants.**

**Equity No. 87–273 (ELP).**

United States District Court, S.D. New York.

Dec. 12, 1988.

Simon H. Rifkind, Stuart Robinowitz, Gerard E. Harper, Stephen M. Merkel, Paul, Weiss, Rifkind, Wharton & Garrison,

New York City, for Warner Communications Inc.

Fred E. Haynes, Asst. Chief, Frederic Freilicher, Professions & Intellectual Property Section, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for the U.S.

## OPINION

PALMIERI, District Judge:

This case is presently before the court on the motion of Warner Communications Inc. and its subsidiary, Warner Bros. Inc., (collectively "Warner") for an order modifying the antitrust consent judgment that has subjected Warner to injunctive restrictions since January 1951.[1] That judgment currently bars Warner, a motion picture producer and distributor, from owning or operating motion picture theatres.

In August 1986, this court provisionally approved Warner's application to purchase a beneficial interest in motion picture theatres, expressing no opinion on the merits of any acquisition and requiring Warner to seek the court's approval pursuant to the consent judgment once the Justice Department had reviewed any proposed acquisition. In addition, the court's order required Warner to hold separately any theatres it might purchase. The present motion concerns a proposed joint venture between Warner and Paramount Pictures, Inc. ("Paramount"), a subsidiary of Gulf + Western Corp. Paramount is not presently barred from the exhibition business and in 1986 acquired beneficial ownership of several theatre chains. Those chains have now been consolidated into Cinamerica Theatres, L.P. ("Cinamerica"), which currently owns and operates approximately 469 screens in 119 theatres. In February 1987, pursuant to this court's 1986 order, Warner provisionally entered into a joint venture with Paramount involving the ownership of Cinamerica. Pursuant to the 1986 Order, Warner's continued participation in the joint venture is conditioned on a showing that such an engagement will not unreasonably restrain competition, and Warner presently "holds separate" its interest in Cinamerica.

After a year-long investigation, the Justice Department declared that it would not challenge Warner's acquisition of a 50% interest in Cinamerica, and the court set the matter down for a hearing which was held March 25, 1988, after a six week notice and protest period. At that hearing, the Justice Department reiterated its determination not to challenge the merger, and appeared to expect the court to accept that determination. This the court was unable to do. The Attorney General's concessions to the court regarding what might be widespread anti-competitive behavior in this industry left open a number of crucial questions that the court felt needed to be answered before the motion could be decided. At the conclusion of the hearing, the court stated:

"I consider the record inadequate because, in my opinion, relevant aspects of the problem do not appear to have been carefully explored or clarified. I respect the conclusions of the Attorney General, but where those conclusions are uttered without a sufficient factual basis I have a right and a duty to question them.

"I do not wish to be placed in a position of making adjudications on an inadequate record. I not only feel constrained to await the report of the Attorney General, which has been promised for the end of this month, but I wish to assess the results of his investigation with respect to the matters which have been raised at this hearing before making any adjudication.

"His unsupported conclusions and his comments, which do not appear to have a demonstrable factual basis, are not persuasive.

"I therefore feel that this hearing should be adjourned *sine die* and the Court will determine at a later date whether a further hearing is necessary

---

1. The original consent judgment, entered January 4, 1951, is reported at 1950–51 CCH Trade Cas. ¶ 62,765.

or desirable and what further steps need to be taken in this matter."

This matter requires caution on the court's part. It involves two of the largest distributors in the industry and more than one hundred theatres. An expenditure of over one hundred fifty million dollars is involved. Despite our best efforts, we have been unable to develop an adequate factual record on which to base an effective and long range decision on this motion. In short, Warner has failed to carry its burden of demonstrating that the requested relief will not unreasonably restrain competition. But that is because of gaps in the record which are due to the nature of the Department of Justice's attention to this case. *See* Part IV, *infra.* We believe the wise course in this situation is to grant the requested relief on express conditions —including requirements that Warner continue to "hold separate" any interest in Cinamerica and that its and Cinamerica's bidding and licensing practices be reviewed by this court at the end of 1989. Hopefully, this will assure a full resolution of the issues raised by the present motion.

## I

### Background

Commenced in July 1938, just over fifty years ago, this case, *United States v. Paramount Pictures, Inc., et al.*, Equity No. 87–273 (S.D.N.Y.) (hereinafter *"Paramount Pictures"*), concerned widespread anti-competitive behavior in the motion picture industry. At that time, a few studios, which owned production, distribution and exhibition facilities, dominated and controlled the industry. The eight *Paramount* defendants[2] regularly accounted for over 65% of the national market for motion pictures. *Paramount Pictures*, 66

F.Supp. 323, 334 (S.D.N.Y.1946). A three judge court of the Southern District of New York, Circuit Judge Augustus N. Hand presiding, tried the case in October and November 1945. The court found that the defendants had restrained and monopolized the distribution and exhibition of motion pictures in violation of Sections 1 and 2 of the Sherman Act.[3] *Paramount Pictures*, 66 F.Supp. 323 (S.D.N.Y.), *findings entered*, 70 F.Supp. 53 (S.D.N.Y.1946), *aff'd in part, rev'd in part and remanded*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), *on remand*, 85 F.Supp. 881 (S.D.N.Y.1949). The defendants engaged in numerous illegal practices: horizontal and vertical price fixing, block booking, and arrangements known as "formula deals," "master agreements" and "franchises." These latter practices involved the distribution of groups of a producer's films to circuits of theatres. The Supreme Court noted that these practices "eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." *Paramount Pictures*, 334 U.S. 131, 154, 68 S.Ct. 915, 927, 92 L.Ed. 1260 (1948).

On direct appeal, the Supreme Court affirmed the district court's findings in almost all respects. *Paramount Pictures*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). However, the Supreme Court found that the system of supervised competitive bidding designed by the lower court as a remedy would embroil the court too much in the business affairs of the defendants and therefore remanded on the

---

2. The eight *Paramount* defendants were Paramount Pictures, Inc., Twentieth Century–Fox Film Corporation, Loew's Incorporated, Radio–Keith–Orpheum (RKO), Warner Brothers, Columbia Pictures Corporation, Universal Pictures Corporation, and United Artists (many of their subsidiaries were also defendants). Columbia, Universal and UA were not fully integrated: Columbia and Universal engaged only in production and distribution, and UA only in distribution. These three companies were thus con-

sidered the three "minors" and the others the five "majors". As a result of the winding up of RKO and the merger of UA with M–G–M (the successor to Loew's), there are now six surviving *Paramount* defendants.

3. The Sherman Act is currently codified, as amended subsequent to entry of the consent judgments, at 15 U.S.C. § 1 *et seq.* (1982).

question of an adequate alternative remedy. A series of consent judgments followed.[4] Because this case was actually litigated, the judgments are not consent decrees in the traditional sense. Only the details of relief were negotiated and entered by consent, findings of guilt having been entered and upheld. The integrated companies were required to divest themselves of their theatres. *Paramount Pictures*, 85 F.Supp. at 895–96.

At the heart of the consent judgments was the licensing injunction, prohibiting the defendants:

> From licensing any feature for exhibition upon any run in any theatre in any other manner than that each license shall be offered and taken theatre by theatre, solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres or others.

*Warner Consent Judgment* § III(8), 1950–51 CCH Trade Cas. ¶ 62,765, at 64,266.[5]

Additionally, the judgments restricted future acquisitions, the distributor defendants generally being prohibited from engaging in the exhibition business "except that permission ... may be granted by the Court ... upon a showing that any such engagement shall not unreasonably restrain competition in the distribution or exhibition of motion pictures." *Warner Consent Judgment* § VI(B), 1950–51 CCH Trade Cas. ¶ 62,573, at 64,272.[6]

Since the entry of the consent judgments, a number of changes of significance in the motion picture industry have taken place. For example, the development of the videocassette recorder and the proliferation of cable television networks have added to the potential revenue sources for film makers and distributors. This, in turn, has facilitated the availability of financing for non-integrated participants in the motion picture industry. Moreover, important producers and distributors have come into existence since the judgments were entered, and large national and regional circuits of theatres have developed, due in large measure to the effect of the licensing injunctions in the *Paramount* judgments.

Distribution on a national or regional level has replaced the system of runs and clearances which this court found unlawful in the 1940s. This form of distribution capitalizes on the benefits of television advertising, which is ineffective without broad distribution in an advertising area.

These are important considerations in the present motion, as far as they go. However, they only partially resolve the issues before the court. The words of Justice Cardozo in *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), ring particularly true here.

> There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether any-

---

**4.** The judgments in their original forms are reported as follows:

  *RKO:* 1948–49 CCH Trade Cas. ¶ 62,335;
  *Paramount:* 1948–49 CCH Trade Cas. ¶ 62,377;
  *Columbia, Universal and UA:* 1950–51 CCH Trade Cas. ¶ 62,573;
  *Warner:* 1950–51 CCH Trade Cas. ¶ 62,765;
  *Twentieth Century–Fox:* 1950–51 CCH Trade Cas. ¶ 62,861;
  *Loew's:* 1952–53 CCH Trade Cas. ¶ 67,228.
  When Paramount and RKO entered into their respective consent judgments, the action was severed and terminated as to these defendants. *See United States v. Loew's Inc.*, 1950–51 CCH Trade Cas. ¶ 62,573, at 63,677. Thus, since 1950 the action with respect to the remaining defendants, including Warner, has been captioned "*United States v. Loew's Inc.*" rather than "*United States v. Paramount Pictures, Inc.*"

**5.** *Accord Loew's Consent Judgment* § II(8), 1952–53 CCH Trade Cas. ¶ 67,228, at 67,327; *Fox Consent Judgment* § II(8), 1950–51 CCH Trade Cas. ¶ 62,861, at 64,546; *Columbia, Universal and UA Consent Judgment* § II(8), 1950–51 CCH Trade Cas. ¶ 62,573, at 63,678; *Paramount Consent Judgment* § II(8), 1948–49 CCH Trade Cas. ¶ 62,377, at 63,011.

**6.** *Accord Loew's Consent Judgment* § III(7)(b), 1952–53 CCH Trade Cas. ¶ 67,228, at 67,328 ("will not unduly restrain competition"); *Fox Consent Judgment* § III(7)(b), 1950–51 CCH Trade Cas. ¶ 62,861, at 64,547 (same); *Paramount Consent Judgment* § III(6)(b), 1948–49 CCH Trade Cas. ¶ 62,377, at 63,012 (same); *RKO Consent Judgment* § III(6)(a), 1948–49 CCH Trade Cas. ¶ 62,335, at 62,866 (same).

thing has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business [the subject of the decree] as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

The decree in *Swift*, entered in 1920, enjoined the five major meatpackers from holding any interest in several lines of business, including the wholesale and retail distribution of other kinds of foods, as to which the defendants' control and domination of the meatpacking industry was thought to give them an unfair competitive advantage. The Court blocked the defendants' attempts to modify the decrees. Of course, every decision whether to modify a consent decree (or as in this case a judgment entered on consent after an adjudication of guilt) "must be based upon the specific facts and circumstances that are presented." *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 249, 88 S.Ct. 1496, 1500, 20 L.Ed.2d 562 (1968); *see*

*New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 969–72 (2d Cir.1983).

## II

### The Facts

Warner is a major producer and distributor of motion pictures, and has been since before the 1930s. Over the past fifteen years, Warner's annual national market share of theatrical film rentals fluctuated between 5% and 23%. From 1983 to 1987, Warner achieved market shares between 12% and 19%.[7]

Paramount has also been a major producer and distributor of motion pictures for more than half a century. Over the past fifteen years, its annual national market share has fluctuated between 9% and 24%. Over the last five of those years, its share ranged between 10% and 22%.[8] Paramount owns and operates several chains of motion picture exhibition theatres. After Warner purchased a 50% interest in these theatres, the joint venture became known as Cinamerica Theatres, L.P. ("Cinamerica"). At the heart of this group of theatres is the Mann chain, which operates approximately 356 screens, including nine of the seventeen in Westwood, a section of West Los Angeles, California.[9] The Westwood market is considered by some to be, along with the upper east side of Manhattan, the most important market in the country. It is generally believed that a successful run in Westwood or in the Manhattan east side area foreshadows nationwide success.

Cinamerica also has significant holdings in Fairfield County, Connecticut,[10] and in areas of California, Alaska, New York, Arizona, Colorado, Idaho, Texas, Utah and

---

7. *Variety Annual,* p. 38 (January 20, 1988).

8. *Ibid.*

9. The Mann Theatre Chain includes a number of theatres which were owned by Twentieth Century–Fox before the entry of the consent judgments. The remaining injunctive restrictions on Mann are due to expire in 1990. *See United States v. Paramount Pictures, Inc.,* 1980–2 CCH Trade Cas. ¶ 63,553, at 76,951 to 76,952.

10. According to Warner's submissions, Cinamerica operates 15% of the screens in a market it defines as including Southern Fairfield County as well as Eastern Westchester County, New York, although Cinamerica has no holdings in Westchester. We cannot deduce what Cinamerica's holdings are in Fairfield alone from the submissions of the parties.

Wyoming. It controls a monopoly in Durango, Colorado, at least half the screens in eight cities,[11] and at least one-third of the screens in twelve additional cities.[12]

Warner has submitted a proposed order, the most significant provision of which is that "Cinamerica shall be free, without further order of this court, to compete in theatrical exhibition through the construction of new theatres and the expansion or acquisition of theatres." In addition, Warner asks that all limitations on its participation in the day to day management of Cinamerica be removed.

### III

*The Governing Legal Standards*

■ According to *United States v. American Cyanamid Co.*, 719 F.2d 558, 563–64 (2d Cir.1983), *cert. denied*, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984), where the language of a consent decree clearly provides a legal standard, the court must abide by that language. Because the consent decree in *American Cyanamid* was entered in lieu of a trial on the merits of the defendant's guilt, the court held that the decree should be treated where possible as a contract. In contrast to the situation presented in *American Cyanamid,* this case involves a consent judgment which was preceded by a fully adjudicated finding of guilt affirmed in nearly all respects by the Supreme Court after plenary review. *Paramount Pictures,* 334 U.S. at 141–61, 68 S.Ct. at 921–31. Application of *American Cyanamid* must be tempered with an awareness that our duty involves a protection of the public interest which goes beyond a theoretical "contract" between the Government and Warner. Our interpretation and application of the consent judgment must be undertaken with our duty as a court of equity firmly in mind.

The consent judgment provides, in part: [Warner] shall not engage in the exhibition business ... except that permission

to [Warner] to engage in the exhibition business ... may be granted by the Court upon notice to the Attorney General and upon a showing that any such engagement shall not unreasonably restrain competition in the distribution or exhibition of motion pictures.

*Warner Consent Judgment* § VI(B), 1950–51 CCH Trade Cas. ¶ 62,765, at 64,272. This language places the burden of persuasion squarely on Warner and even then allows the court discretion whether to grant permission. We do not read this language to preclude the court's ability to continue supervision over Warner or Cinamerica, if the present motion is granted. Warner contends that the consent judgment provides the court with one and only one opportunity to decide whether Warner may engage in the exhibition business under the consent judgment, and that once permission is granted the court relinquishes all supervisory power. The court's power as a court of equity is not so limited. Nothing in the language of the consent judgment purports to terminate the court's power at the conclusion of a single proceeding. Such a limitation would render ineffective the court's ability to protect the public interest. In light of Warner's inability to carry its burden under the consent judgment in the present motion, *see* Part IV, *infra,* it would appear equitable to allow Warner to participate in the joint venture subject to continuing supervision.

Although the operative language of the judgment is modeled on the Sherman Act, the motion here involves vertical integration, and we apply the standards developed under Section 7 of the Clayton Act, 15 U.S.C. § 18 (1982). *Cf. American Cyanamid,* 719 F.2d at 566. In particular, *Fruehauf Corp. v. FTC,* 603 F.2d 345, 353 (2d Cir.1979), summarizes the relevant criteria in determining whether to permit integration.

Most important among the factors are the nature and economic purpose of the

---

**11.** Boulder, CO. (11 of 22 screens); Provo, UT. (10 of 19); Laramie, WY. (2 of 4); Contra Costa, CA. (21 of 32); Stockton, CA. (9 of 16); San Luis Obispo, CA. (11 of 20); Valencia/Newhall, CA. (10 of 15); and Visalia, CA. (6 of 11).

**12.** These include Denver, CO. (66 of 183); Fresno, CA. (16 of 41); Lubbock, TX. (8 of 21); and Modesto, CA. (10 of 23).

arrangement, the likelihood and size of any market foreclosure, the extent of concentration of sellers and buyers in the industry, the capital cost required to enter the market, the market share needed by a buyer or seller to achieve a profitable level of production (sometimes referred to as "scale economy"), the existence of a trend toward vertical concentration or oligopoly in the industry, and whether the merger will eliminate potential competition by one of the merging parties. To these factors may be added the degree of market power that would be possessed by the merged enterprise and the number and strength of competing suppliers and purchasers, which might indicate whether the merger would increase the risk that prices or terms would cease to be competitive.

Finally, we take note of the admonition of the Court in *American Cyanamid,* 719 F.2d at 567, that it is "error to apply 'contemporary economic theory' to the extent it may be distinct from precedent, and to fail to apply the standard [*Fruehauf*] framework of analysis...."

Although dressed up in *Fruehauf*'s clothes, much of Warner's argument derives from theoretical speculations about human behavior which the court finds unpersuasive. It is almost a leitmotif running through the affidavits and memoranda that the threat of prosecution under the antitrust laws and the fear of litigation by other parties involved in the motion picture industry will be sufficient to assure that no anti-competitive behavior will ensue from this acquisition. That line of reasoning is specious. These consent judgments were fashioned after years of litigation in which this industry was shown to have a proclivity for anti-competitive behavior. If the specter of criminal prosecution and civil litigation were a sufficient prophylactic for antitrust violations, the consent judgments in this and many other cases would never have been necessary. Warner will have to present far more persuasive grounds for what is tantamount to the effective dismantling of these judgments. *See United States v. Swift & Co., supra,* 286 U.S. at 119, 52 S.Ct. at 464. Warner cannot do by indirection what it cannot do directly.

## IV

### *Assessment of Warner's Application*

Application of the relevant criteria convinces the court that the proper course is to approve the acquisition so long as Warner continues to hold its Cinamerica interests separately, and provided there is a review of the situation in a year's time in order to assess compliance with the letter and spirit of the consent judgment governing Warner.

### A. *The Business Purpose of the Acquisition.*

An important factor in assessing a potential merger is whether it is motivated by a legitimate business purpose. *Brown Shoe Co. v. United States,* 370 U.S. 294, 329, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962); *Fruehauf, supra,* 603 F.2d at 359. Here, Warner claims it "wishes to be able to compete on an equal footing with its principal rivals." It also asserts that it is presented "with an attractive opportunity to diversify in an area closely related to other core areas of our business." This would allow Warner to diversify against the risks inherent in motion picture production and distribution—essentially a volatile business. Entry into exhibition would give Warner "the opportunity to share some portion of the profits on the successful films of other distributors." Finally, according to Warner, entry into exhibition would reflect "our long-term commitment to the theatre business" because of the fact that "box office success can be tremendously important to the success of a film in home video sales, pay cable, and television."

The last two of these reasons—diversification and demonstration of commitment to the film industry—appear entirely legitimate. But they do not require sweeping and permanent exemptions from the consent judgments. Most important, these purposes are best served by continued adherence to the requirement that films be licensed theatre by theatre, solely upon the

merits, and without discrimination in favor of affiliated theatres, circuit theatres or others. In addition, the goals of diversification against risk and demonstrating commitment to the industry, while legitimate, may be served without Warner having a day to day hand in the operation of Cinamerica. Indeed, much of Warner's argument that no anti-competitive effects will ensue from this acquisition is premised upon the independence of Cinamerica's management. Furthermore, no specific business purpose has been asserted which necessitates diminished independence of Cinamerica's management. This counsels us to allow Warner continued ownership in Cinamerica but to maintain the provisions of the court's 1986 order which guarantee Cinamerica's independence from Warner.

The other asserted business purpose—that Warner would like to compete on an equal footing with others in the industry—is somewhat ambiguous. Warner could be implying that it cannot compete as a producer and distributor without complete vertical integration. Warner repeatedly refers to the existence of other vertically integrated companies in this industry. But if Warner is arguing that its continued viability in this industry is impossible without vertical integration, much of its argument that the acquisition will not add to potential foreclosure of competitors would be meaningless.

Instead, we believe Warner to be arguing that if it is permitted to enter the exhibition business, it should be free to acquire theatres without court approval. It is true that expansion is an important business consideration. However, we are not prepared to say that expansion without limitation, in these circumstances, is appropriate. For many years, this court was required to approve every theatre which was built or sold. Modifications of the judgments have made that task unnecessary. On the other hand, this is a concentrated industry in which there has been a recent trend toward vertical integration which appears significant. There also appears to be a climate of non-compliance with the heart of the consent judgments—that films be licenced theatre by theatre, solely on the merits and without discrimination. The court has repeatedly expressed concern about this problem and the Attorney General has not as yet provided the court the results of his investigations. Given these factors, the court is unwilling to relinquish all supervision. Nor is continued supervision of Warner's participation in this joint venture inconsistent with a program of expansion. We will therefore require Warner to maintain its holdings in Cinamerica separately. More problematic is the question of the appropriate degree of court supervision of expansion by Cinamerica, which is taken up in Part V, *infra*.

### B. The Likelihood of Foreclosure of Access to Film Product or Exhibition Space.

An important consideration is the likelihood that foreclosure of access to film product or exhibition space might be caused by the proposed acquisition. *Brown Shoe, supra*, 370 U.S. at 328–29, 82 S.Ct. at 1525–26; *Fruehauf, supra*, 603 F.2d at 352 & n. 9. Generally, this is an assessment of the probability that supply or demand for the product will diminish as the result of the acquisition, potentially harming competition. An examination of exhibition and distribution is required. We are not sure what to make of the requirement in *Fruehauf* that the likelihood of actual foreclosure as well as the potentiality of foreclosure be considered. *Fruehauf*, 603 F.2d at 352–53. Counsel for Warner would have us engage in speculation about human behavior in general and the behavior of their clients in particular. This is too nebulous a task for a court to undertake. Suffice it to say that this industry has shown a proclivity for anti-competitive behavior when given the opportunity and that there is (as yet unspecified) evidence of a climate of non-compliance with this court's consent judgments. We do not believe that the mere existence of the antitrust laws and the presence in the industry of parties with adverse interests is enough to permit us to sit back and allow the dismantling of the consent judgments.

Beyond that, we look to the potential for foreclosure in the relevant markets—exhibition and distribution. We are concerned with the possible adverse effects in the event that Warner and Paramount distribute only to Cinamerica, or that Cinamerica exhibits only Warner and Paramount films. If only a small segment of a market is controlled by these firms and they decide to "foreclose" others, no significant effect on competition will ensue. Instead, a realignment will take place, the exhibitors which had been supplied by Warner and Paramount now exhibiting other distributors' product, and the distributors who had used Cinamerica's theatres now distributing films elsewhere. See Fruehauf, 603 F.2d at 352 n. 9. On the other hand, at some point the market presence of the new vertically integrated company becomes great enough that the potential anti-competitive effects become a significant concern. See Brown Shoe, supra, 370 U.S. at 328–29, 82 S.Ct. at 1525–26. In Fruehauf, the court did not address the limits at which this concern becomes prohibitive.

Warner argues that only 2–3% of the national exhibition market is affected by this purchase. According to Warner, the acquisition is such a small part of the national market that the potential for foreclosure is de minimis. Warner correctly points out that the comparable market share of the purchasing (or "downstream") firm in Fruehauf was approximately 3–6%. However, in this case the proper mode of analysis also requires the assessment of the relevant local markets. Many of Cinamerica's theatres have a substantial market share of local markets. In addition, this acquisition will leave many of the local markets with sizeable percentages of the market controlled by integrated exhibitors. Although they will remain integrated whether or not Warner participates in the joint venture, the potential for abuse of market power by this joint venture is increased by Warner's participation. And that potential would be increased further by additional integration of other firms. For these reasons, we are unwilling to give a final blanket approval to Warner's participation in the joint venture.

Many of the local markets would be left with 30–40% of the market controlled by integrated exhibitors. We believe this to be significant. This is an important reason why we feel obliged to require that Warner hold separately its interests in Cinamerica and that Cinamerica be subject to some supervision by the court.

Several areas in particular are problematic: Westwood, California, and Fairfield County, Connecticut, are both areas in which Cinamerica has a significant presence, along with other integrated exhibitors. In addition, Cinamerica controls 50% or more of the screens in nine smaller cities. Finally, Cinamerica operates one theatre in Manhattan, where much of the market is integrated. The concentration and integration in all of these areas present a temptation for abuse of market power. The court's continued participation in this case is, for that reason, desirable. Nonetheless, we do not believe that any of the theatres in these areas need be divested by Cinamerica. The injunctive restraints of the consent judgments on licensing, along with the court's review of Cinamerica's bidding and booking practice and any expansion it undertakes, will be sufficient restraint on the potential for abuse of market power. Were it not for these restraints, we would not feel justified in granting the motion.

In Westwood, Cinamerica operates nine of seventeen screens. Westwood is, along with Manhattan, the most important market. A successful run in Westwood often precedes a successful nationwide release and the videocassette, cable, foreign, and television profits which ensue. Much of Westwood's importance lies in the nature of the movie audience there—members of the film industry and important critics. The same is true of the upper east side of Manhattan.

Warner makes a persuasive argument that the dominance of the Westwood screens in West Los Angeles has been diminished by an invasion of nearby theatres. The most significant new entrants are in Century City, a development on the former back lot of Twentieth Century–Fox, which

lies at Westwood's south eastern edge. AMC, a national theatre chain, established fourteen new screens there in 1987. In addition, Cineplex Odeon, another national chain, expanded its theatre from two to four screens. These sixteen new screens have combined with a recent addition of upscale shops and restaurants to divert business away from the Westwood theatres, according to Warner. Additionally, Cinamerica's box office grosses at its nine Westwood screens have declined approximately 20% in the last year,[13] a decline Cinamerica attributes primarily to the entry of the sixteen new screens in Century City. Taking Westwood and Century City as a single area—and ignoring the extraordinary growth of theatres in West Los Angeles, even within ten miles of Westwood—Cinamerica holds a significant position, but no longer has such complete dominion and control. The Westwood area, long an exhibition area of great importance to the film industry, appears in a state of flux. While continued supervision of Cinamerica is appropriate, we do not wish to hobble the company with undue restrictions. We believe the discussion in Part V, *infra*, strikes an appropriate balance between the needs of competition as protected by the consent judgments and of Cinamerica as a competitor in Westwood.

Cinamerica operates twenty one screens in Fairfield County, Connecticut. Warner has, for purposes of analysis, divided this area into North Fairfield County and a second area comprised of South Fairfield County and East Westchester County, New York (which is adjacent to Fairfield). The Justice Department accepts this division, but its reasoning for doing so is unclear. Warner asserts that all the theatres in South Fairfield and in East Westchester advertise in the same local newspaper. But there is no evidence in this case that this newspaper's readership is the appropriate gauge of the market for motion picture

viewing. We are left without any way to make an independent assessment of the composition of the relevant local market, and without any way to evaluate the concentration in this market should we remain unpersuaded by Warner that its definition of the market is the correct one. This kind of gap, often resolved in the crucible of an adversary proceeding, leaves us without the ability to make an independent assessment of the dangers of concentration in this area—an area which the Justice Department identifies as containing more integrated firms, and thus presenting more potential for foreclosure of product, than any other local market. In light of our inability to determine the potential for foreclosure in this area—or even to determine the appropriate market—we believe the solution we have outlined, calling for continuing supervision of Cinamerica's practices, is equitable.

The Justice Department identifies several other areas where Cinamerica and other integrated firms operate. The potential for foreclosure of product in these areas runs between thirty and fifty percent. In other words, if all the vertically integrated exhibitors in these areas refused to deal with any distributors but their own, the available theatre space would diminish by thirty to fifty percent. Similarly, the available product would diminish. According to the Justice Department, these figures are too low to realistically threaten competition. We disagree. The potential for foreclosure presented by this case is in line with that found unlawful by the Supreme Court in *Brown Shoe*. Again, however, this problem is attenuated by the applicability of the licensing injunctions, the court's continued supervision and the "hold separate" order.

Finally, the upper east side of Manhattan, where Cinamerica owns one screen, has been identified as "the most important market because of the concentration of na-

---

**13.** For the six months ending April 3, 1986, the theatres' gross receipts were $5.180 million, and for the six months ending April 2, 1987, they were $4.996 million. In contrast, for the six months ending March 31, 1988, gross receipts totaled $3.934 million. We believe these figures reflect only the receipts at the Mann theatres in

Westwood, as the context in the Fellman affidavit so indicates. But the chart in the affidavit is ambiguously entitled "Gross box office receipts at Mann Theatres." Of course, we expect counsel for Warner to notify us if our interpretation of this ambiguity is incorrect and to supply the correct figures for the Westwood theatres.

tionally influential film critics and news media." K. Harris, *Independents Squeezed in N.Y. Movie Market*, Los Angeles Times, pt. IV, at 1 (January 3, 1988). Although Cinamerica has only one screen in Manhattan, serious and troubling allegations have been made about the abuse of market power by theatre owners in this area. Exhibitors and distributors who deal exclusively with each other are said by the Justice Department to have formed "track relationships" and "marriages."[14] The Justice Department has been quoted as taking the position that these relationships do not violate the antitrust laws, *id.* at 4, and has not informed the court of the details of its investigations about these allegations. Again, we are left without the ability to come to an independent judgment about the validity of this point of view.

In sum, the areas in which Cinamerica is engaged in exhibition are areas where there is a potential for foreclosure of access to screen space and other anti-competitive behavior. The court is unable independently to evaluate the situation, for lack of evidence and extended analysis by the Justice Department. Given that situation, it would be inappropriate to grant Cinamerica carte blanche to expand. On the other hand, it would be unfair to block the acquisition altogether, for we are not presented with the full picture.

The same logic applies when we assess the potential for foreclosure of exhibitors' access to film product. Warner and Paramount together comprise approximately 30% of the national market in distribution. A decision by these two distributors to restrict the availability of their product would have a very significant impact on exhibitors, and would almost certainly harm competition. In contrast, the supplier in *Fruehauf* accounted for approximately one half of one percent of total sales to manufacturers other than Fruehauf.

*Fruehauf, supra,* 603 F.2d at 354. We cannot ignore the potential for abuse of market power should Cinamerica expand to the point where it could adequately handle a significant portion of Warner's and Paramount's output. Cinamerica, with 2% or even 3% of the nation's screens, is currently in no position to do so. And with Warner and Paramount still dependent on their relationships with unintegrated circuits, there is a convincing argument that it is not in Warner's interest to attempt foreclosure today. Nonetheless, the potential for abuse is so great that the court cannot in good conscience allow this joint venture to be relieved of all supervision for all time.

## C. The Degree of Concentration.

Another factor of some importance is the degree of concentration in the industry. Several methods can be used to quantify concentration in an industry. Traditionally, the courts calculated the "four firm" and "eight firm" concentrations—a simple addition of the market shares of the largest four or eight firms in the industry. Thus in *Brown Shoe, supra,* 370 U.S. at 300, 82 S.Ct. at 1510, the Supreme Court found a four firm concentration of 65% to be significant support in its decision to bar a proposed vertical integration. In *Fruehauf,* the court also found a significant degree of concentration. The four firm figure was approximately 65–71%, and the eight firm concentration, 93–95%.[15] And in *FTC v. Warner Communications Inc.,* 742 F.2d 1156, 1163 (9th Cir.1984), the Ninth Circuit reversed the denial of a preliminary injunction to block a horizontal merger in the recording industry, finding a significant degree of concentration in this industry: the four firm concentration was 67%, which would have been 75% post merger.

The four firm concentration of distributors in this industry, by our calculations

---

**14.** There has been an unfortunate use of misleading euphemisms in this case. Exclusive dealing and other potentially unlawful and apparently secret arrangements have been called "marriages," "tracks," and "relationships." Licensing injunctions have been called "conduct provisions."

**15.** The *Fruehauf* court found no evidence that existing concentration would be increased by the merger, *id.,* 603 F.2d at 359, and thus did not consider concentration a determinative factor.

taken from figures supplied in the record,[16] has ranged between 53% and 69% since 1982.[17] Similarly, the eight firm concentration during that period has ranged between 83% and 96%. The Justice Department has since 1982 preferred the use of the Herfindahl–Hirschman Index (HHI) to quantify industry concentration. *See* 1984 *Merger Guidelines, reprinted in* CCH Trade Reg. Rep. ¶ 13,103 (1988); 1982 *Merger Guidelines, id.,* ¶ 13,102. The HHI is calculated by adding the squares of the individual market shares of all firms in an industry. *Ibid.* Under the HHI, a quantification of over 1000 is considered by the Justice Department to reflect moderate concentration, and it considers a figure of over 1800 to reflect a high degree of concentration. We have found no explanation in the guidelines or in the literature for the choice of these cutoff points aside from the Justice Department's statement in the Guidelines that "[a]n empirical study by the Department of the size dispersion of firms within markets indicates that the critical HHI thresholds at 1000 and 1800 correspond roughly to four-firm concentration ratios of 50 percent and 70 percent, respectively." 1984 *Merger Guidelines* § 3.1, *reprinted in* CCH Trade Reg. Rep. ¶ 13,103, at 20,560 (1988). The HHI for distributors in this industry since 1982 has ranged between 1067 and 1645.

Exhibition could not be said to be concentrated on a national scale. According to the 1987 *Encyclopedia of Exhibition* (*see* Exhibit 17 to the Affidavit of Terry S. Semel, sworn to January 27, 1988), there were approximately 22,000 screens in the United States in 1987. The holdings of most of the largest exhibitors are set out in the Affidavit of Maurice Silverman, sworn to January 11, 1988, pp. 11–12. The four largest together control approximately 5,400 screens, or 24% of the national market. The eight firm concentration appears to be about 30%, and the HHI, less than 200. On the other hand, there is significant concentration in some of the areas where Cinamerica operates. As we have noted above, Cinamerica controls half or more of the screens in nine local areas.

This transaction is thus one in which there is significant concentration at both the exhibition and distribution levels. As we have noted, anti-competitive behavior on the part of Warner and Paramount could have a devastating effect on the industry. The fact that this acquisition will not increase concentration is also significant. It counsels toward allowing the acquisition. *See Fruehauf, supra,* 603 F.2d at 359. But other factors, including the already high degree of concentration in the industry, counsel toward continuing supervision of Warner's participation in the joint venture.

### D. Barriers to Entry.

Warner represents that financial barriers to entry are minimal. The Justice Department disagrees with Warner's representations but does not consider this a significant factor. We accept the factual representation of the Justice Department, but disagree as to the appropriate interpretation to be made of this factor. The Justice Department persuasively argues that the ability of outsiders to acquire goodwill in the industry is very limited. Without that ability, supposedly easy financing would be meaningless. As the Ninth Circuit noted in a similar context—the recording industry, "the [FTC] presented evidence showing the difficulty of entering the distribution market due to high capital costs, lack of expertise, inability to attract top performers, disadvantages in obtaining radio air play and point of sale promotion, and inability to demand and receive payment from retailers

---

16. *Variety Annual* p. 38 (January 20, 1988).

17. We choose 1982 because it was a particularly highly concentrated year for this industry. We are mindful of Warner's correct observation that even annual figures do not accurately reflect this industry's volatility. Even the week to week figures often fluctuate significantly. For instance, the combined market share of revenue for Paramount and Warner has been, in some weeks, greater than 50%. Economic Report of William Landes, Table 2, p. 17 (filed February 1, 1988). There is thus significant danger in relying on any particular year as an indicator of future performance. A chart reflecting distributor concentration since 1970 is attached as an appendix.

on an equal basis with established distributors." *FTC v. Warner Communications Inc.*, 742 F.2d 1156, 1163 (9th Cir.1984). In contrast to the situation here, the FTC in *Fruehauf* presented no evidence that existing barriers would be increased by the merger. *Fruehauf, supra,* 603 F.2d at 359. The barriers to entry here support our decision to continue our supervision of this aspect of the industry. If anything, they counsel toward disallowing the acquisition. Indeed, it is possible that if more firms are permitted to integrate vertically, barriers to entry will increase.

### E. Existence of a Trend Toward Vertical Integration.

The trend toward vertical integration in this industry is very significant. It has been a matter of some discussion in the press and of great concern to the court. Indeed, Warner's eagerness to "compete" on an equal footing with industry rivals who own theatre chains is especially troubling. It is this factor, as much as any, which leads us to a path of caution. *Brown Shoe, supra,* 370 U.S. at 332–34, 82 S.Ct. at 1527–29. In *Fruehauf,* no evidence of a trend was presented. Here, in contrast, in the past two years, many distributors have plunged into exhibition. Paramount acquired what has become Cinamerica in 1986. Tri–Star pictures, which has merged with Columbia, acquired the Loew's theatre circuit, consisting of approximately 470 screens, and Universal owns a 50% interest in Cineplex Odeon, with approximately 1650 screens. Together, integrated circuits now account for about 10% of the nation's screens, up from none in 1980.

Warner puts forth much evidence that exhibition in small towns with high concentration does not display oligopolistic behavior. While this is relevant, it is not dispositive. It says nothing about larger cities, where most of the distributors have established exhibition presences. It says nothing about areas where there appears to be anti-competitive behavior.

In addition to actual integration, the Justice Department has indicated that there is evidence of exclusive dealing alliances among exhibitors and distributors. While not revealing the details of its investigations to the court, the Justice Department has observed this behavior, which it terms "customer selection," or, more euphemistically, "relationships," "marriages" or "tracks." The Justice Department agrees at least that "split agreements," whereby exhibitors divide up the available product, are *per se* unlawful. *United States v. Capitol Service, Inc.*, 756 F.2d 502, 506 & n. 1 (7th Cir.), *cert. denied sub nom. United Artists Communications, Inc. v. United States*, 474 U.S. 945, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985). There appears to be continued anti-competitive behavior by exhibitors and distributors in this industry. *See* Letter from Fred E. Haynes of the Antitrust Division to Hon. Edmund L. Palmieri (March 30, 1988) (filed as Exhibit 1 to the Affidavit of Daniel R. Fellman, sworn to on May 13, 1988). On December 2, 1988, Twentieth Century–Fox Film Corporation, a defendant in the Paramount litigation, *see supra* note 2, and a manager of its Indianapolis–Milwaukee–Minneapolis branch office were convicted of criminal contempt, 18 U.S.C. § 401(3). The defendants were found to have engaged in block booking in repeated instances of violation of Section II(7) of the applicable consent judgment restraining the entering into any license "in which the right to exhibit one feature is conditioned upon the licensee's taking one or more other features." Block booking was one of the illegal practices sought to be eradicated by the Paramount decrees. *See supra* p. 880.

It appears that some distributors and exhibitors have either formally or informally agreed to divide up the local markets. Not only does this kind of behavior fly in the face of the requirement of all the consent judgments that films be licensed theatre by theatre, solely upon the merits and without discrimination, but it raises troubling and serious questions as to the vigor with which the antitrust laws are being enforced. While it would be inappropriate to speculate on the legal consequences of facts not before the court, we find this apparent climate of noncompliance with the

*Paramount* decrees and with the antitrust laws to be fraught with serious problems. We cannot allow that climate to go unchecked and unsupervised, and we can see no reason why Warner's participation in the joint venture will be unduly harmed by such supervision.

V

*Supervision of Cinamerica*

■ Warner makes the extravagant claim, without any refutation or comment by the government, that no supervision of Cinamerica is necessary because of the existence of the Hart–Scott–Rodino Antitrust Improvements Act of 1976 [18] ("H–S–R"). The pertinent part of that statute, 15 U.S.C. § 18a (1982 & Supp. III 1985), establishes, according to the House Report, "premerger notification and waiting requirements for corporations planning to consummate very large mergers and acquisitions. The [act] in no way alters the substantive legal standard of [the Clayton Act]." H.Rep. No. 1373, 94th Cong., 2d Sess. 5, *reprinted in* 1976 U.S.Code Cong. & Admin.News 2572, 2637, 2637. Because H–S–R is purely procedural in nature and does not necessarily affect the obligations of Warner and Cinamerica, it cannot serve as a justification for diminishing the effectiveness of the Warner consent judgment. *See Swift & Co., supra.* Congress passed H–S–R to give "the government antitrust agencies a fair and reasonable opportunity to detect and investigate large mergers of questionable legality before they are consummated." H.Rep. No. 1373, *supra*, at 5, 1976 U.S. Code Cong. & Admin.News at 2637. Congress' purpose was to permit the authorities to take enforcement measures in good time and while such measures could still be effective. Warner contends that H–S–R can serve as an adequate substitute for court supervision of the *Paramount* decrees. But the consent judgment itself contemplated continued court supervision in this industry, providing that

> [j]urisdiction of this cause is retained for the purposes of enabling any of the parties and their successors to this consent

judgment, and no others, to apply to the Court at any time for such orders or direction as may be necessary or appropriate for the construction, modification or carrying out of the same, for the enforcement of compliance therewith, and for the punishment of violations thereof, or for other or further relief.

*Warner Consent Judgment* § XI(B), 1950–51 CCH Trade Cas. ¶ 62,765, at 64,275. It would be inconsonant with our continuing duty under this judgment to relegate to the Justice Department the sole responsibility for supervision of a company found to have violated the antitrust laws and currently restrained by an elaborate antitrust injunction. *Swift & Co., supra.*

Furthermore, Warner's reliance on H–S–R as a supposedly adequate substitute for continued court supervision, in light of our discussion in Part IV, *supra*, is unjustified. The consent judgment requires review and supervision on a far more encompassing scale than does H–S–R, which applies only to the "very largest" mergers. H.Rep. No. 1373, *supra*, at 11, 1976 U.S. Code Cong. & Admin.News at 2643. In contrast to the limited application of H–S–R, the consent judgment anticipates a broad review by the court, and in the circumstances of this motion, of Warner's conduct and of non-merger expansion on the part of Cinamerica.

Finally, Warner's argument ignores a problem which this motion in fact highlights. H–S–R serves only as an enforcement tool for the antitrust agencies. The Department of Justice at times countenances a higher level of anti-competitive behavior than do the courts. When that is the case, H–S–R provides little recourse to the aggrieved consumer or competitor, for proceedings pursuant to H–S–R are necessarily secret. Indeed, even state attorneys general, who have assumed a wider antitrust enforcement role in recent years, are not allowed access—even on a confidential basis—to filings under H–S–R. *Lieberman v. FTC*, 771 F.2d 32, 37–40 (2d Cir. 1985). In contrast, proceedings under the

---

**18.** Pub.L. 94–435, 90 Stat. 1383 § 201, codified   in pertinent part at 15 U.S.C. § 18a.

consent judgments are held in open court and on a public record, frequently after a published protest period designed to afford a forum to persons who consider themselves aggrieved.

Unfortunately, the Department of Justice has, in the recent past, devoted enforcement resources to areas other than the judgments which have governed the motion picture industry since the early 1950s. In responding to the present motion, it has not informed the court of the relevant facts beyond the broadest outline, and the adjudication of this motion has been delayed in order to permit the Justice Department to submit a report requested by the court on its factual investigations.[19] We understand that the staff of the Antitrust Division has been cut by 50% and that it must make choices with respect to its enforcement priorities. But whatever the reason may be, we deplore this lamentable state of affairs which denies the court the full benefits of the adversary process in an important area of the law.

This leaves us with the difficult question of the appropriate degree of supervision for Cinamerica. One possibility is a numerical or percentage limitation on Cinamerica's expansion without court approval. Maurice Silverman, who represented the Government for many years in matters relating to the *Paramount* decrees, before becoming an independent consultant for Warner, makes a persuasive argument that such limitations would be unwise. They could be construed as presumptive evidence that an acquisition involving less than the numerical limitation would not unreasonably restrain competition. Under certain circumstances, even a small acquisition can have an unlawful effect on competition.

Mr. Silverman also argues persuasively against a requirement of authorization of every expansion by Cinamerica. This would place an undue burden on Cinamerica, on the government, and on the court as well. Cinamerica would also be placed at a disadvantage in bidding for theatres or sites. In addition, the Antitrust Division, already too thinly staffed to cover all its bases effectively, is hardly in a position to review every expansion by Cinamerica.

We are unpersuaded, however, by Mr. Silverman's proposed solution—to "leave it to the application of the antitrust laws." We believe more is needed. We believe Cinamerica needs the protection of a "hold separate" order. In addition, a review by the court of Cinamerica's expansion, in the context of the local markets in which it operates, as well as a review of its bidding and booking practices, appears to us to be the best way of implementing the court's continuing duty pursuant to the consent judgments without placing an undue burden on Cinamerica or on the court.

## VI

### Conclusion

We believe that the motion should be granted in part, but accompanied by a restrictive modification of the consent judgment including a continuation of the "hold separate" order and the requirement that all pictures be licensed theatre by theatre, solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres or others, and a review of Warner's and Cinamerica's licensing and expansion practices, to be held in the fall of 1989, at which time Warner will be expected to show why its continued ownership and operation of theatres is not anti-competitive under the consent judgments.

An appropriate order is filed herewith.

19. On December 5, 1988, the Department of Justice submitted a 53 page report entitled "The Legality of Customer Selection under the Injunction in the *Paramount* Decrees Against Discrimination in Film Licensing." This report does not purport to furnish the results of any factual investigations. It is a legal memorandum, approximately half of which is devoted to the history of the *Paramount* decrees. In view of this court's conclusion that a full adjudication of this matter cannot be made on the present record and must abide further submissions by Warner, this court intends to make a formal request of the Department of Justice to submit a further report which the court believes will be relevant to its final decision.

APPENDIX

**CONCENTRATION IN THE MOTION PICTURE INDUSTRY
1970-1987\***

| Year | Four Firm Concentration | Eight Firm Concentration | Herfindahl-Hirschman Index |
|------|------|------|------|
| 1987 | 57 | 83[1] | 1067 |
| 1986 | 53 | 84 | 1068 |
| 1985 | 55 | 89 | 1116 |
| 1984 | 66 | 91 | 1337 |
| 1983 | 66 | 93 | 1416 |
| 1982 | 69 | 96 | 1645 |
| 1981 | 60 | 86 | 1174 |
| 1980 | 66 | 93 | 1373 |
| 1979 | 65 | 94 | 1318 |
| 1978 | 67 | 99 | 1495 |
| 1977 | 64 | 96 | 1360 |
| 1976 | 60 | 90 | 1156 |
| 1975 | 63 | 94 | 1374 |
| 1974 | 63 | 93 | 1339 |
| 1973 | 56 | 86 | 1066 |
| 1972 | 64 | 86 | 1254 |
| 1971 | 48 | 71 | 761 |
| 1970 | 58 | 84 | 1066 |

---

[*]Calculations by the Court based upon figures taken from Variety, p. 38 (January 20, 1988).

[1]If Tri-Star Pictures and Columbia are considered as one firm for all of 1987, the eight firm concentration is 87%.