882 F.2d 29
 58 USLW 2130, 1989-2 Trade Cases 68,699
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
LOEW'S INCORPORATED, Warner Communications, Inc. and Warner
Bros., Inc., Defendants.
Appeal of WARNER COMMUNICATIONS, INC. and Warner Bros.,
Inc., Appellant and Defendant-Appellant, Cross-Appellees.
 No. 1059, Dockets 89-6012, 89-6034.
 United States Court of Appeals,
Second Circuit.
 Argued May 16, 1989.
Decided Aug. 3, 1989.
 
 Stuart Robinowitz, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Simon H. Rifkind, Gerard E. Harper, Stephen M. Merkel, Victoria Ortiz, Helen B. Kim; Laurence H. Tribe, Cambridge, Mass., of counsel), for appellant and defendant-appellant, cross-appellees.
 Robert J. Wiggers, Atty. Dept. of Justice, Washington, D.C. (Charles F. Rule, Asst. Atty. Gen., Michael Boudin, Deputy Asst. Atty. Gen., Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., of counsel), for plaintiff-appellee, cross-appellant.
 Before LUMBARD, PRATT, and ALTIMARI, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Warner Communications, Inc. and its subsidiary Warner Bros., Inc. (collectively Warner) appeal from an order of the District Court for the Southern District of New York, Palmieri, J., granting, subject to certain conditions, Warner's motion for an order, pursuant to Part VI(B) of the antitrust consent judgment into which Warner and the government entered in 1951, for permission to engage in the business of exhibiting motion pictures. The district court's order permits Warner to retain its fifty percent interest in Cinamerica Theatres, L.P., a motion picture exhibitor which is a joint venture of Warner and Paramount Pictures, Inc., a subsidiary of Gulf + Western Corp., subject to certain restrictions: Warner is required (1) to hold the ownership of the theatres separate from Warner; (2) to keep the management of Cinamerica wholly separate; (3) to have no involvement in Cinamerica's internal affairs; and (4) to deal with Cinamerica at arm's length. Warner's holding is to continue to be subject to court supervision.
 
 
 2
 The United States, which did not oppose Warner's motion in the district court, now joins Warner in seeking modification of Judge Palmieri's order and the entry of an order permitting Warner to own and conduct the operations of Cinamerica, without restrictions, as one-half owner of that partnership.
 
 
 3
 We find that Warner's ownership of a one-half share in a motion picture exhibition company will not unreasonably restrain competition in the motion picture distribution and exhibition businesses and therefore remand for the entry of an order unconditionally granting Warner's motion.
 
 
 4
 * This litigation arises out of the continuing supervision of a consent judgment entered into by Warner and the government almost forty years ago in the wake of United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). This consent judgment, the original form of which is reported at 1950-51 Trade Cas. (CCH) p 62,765 (S.D.N.Y. January 4, 1951), subjects Warner, in a manner similar to that of the consent judgments affecting the seven other Paramount Pictures defendants, to injunctive restrictions that hinder the vertical integration of the production, distribution and exhibition of motion pictures.
 
 
 5
 Warner and its codefendants were required to divest themselves of all theatres they then owned. Additionally, in order to terminate the anticompetitive practice of the distribution by producers of groups of their films exclusively to circuits of theatres, each of the consent judgments contains a licensing injunction prohibiting the "licensing [of] any feature for exhibition ... in any other manner than that each license shall be offered and taken theatre by theatre, solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres or others." Warner Consent Judgment, Section III(8), 1950-51 Trade Cas. (CCH) p 62,765, at 64,266. The consent judgments also prohibit the acquisition of theatres in the future, and provide, as in Warner's case, that Warner may not engage in the exhibition business, except upon application to the Attorney General and upon a showing to the court "that any such engagement shall not unreasonably restrain competition in the distribution or exhibition of motion pictures." Warner Consent Judgment, Part VI(B); 1950-51 Trade Cas. (CCH) p 62,765, at 64,272.
 
 
 6
 In August 1986, Warner, wanting to buy theatres from several chains, perceived itself to be disadvantaged in the marketplace because most of its competitors are not prohibited from engaging in the exhibition business. Warner therefore moved the court, pursuant to Part VI(B) of the consent judgment, for permission to purchase theatres without prior judicial consent, and Warner proposed to hold separate any interests it might acquire pending approval by the court as specified by the consent judgment. Warner proposed that its management would play no role in the management of such interests during what it hoped would be only brief periods between purchase and judicial review of such transactions.
 
 
 7
 Judge Palmieri granted Warner's motion on August 27, 1986, specifying that Warner could acquire motion picture theatres and related assets without prior judicial consent, provided that it kept title to the exhibition assets in a separate subsidiary, managed and operated those assets separately and moved, pursuant to Part VI(B) of the Warner Consent Judgment, for court approval within thirty days of the acquisition.
 
 
 8
 In February 1987, Warner agreed to buy a fifty percent interest in three theatre chains (the Mann and Festival chains in the West, and the Trans Lux chain in Connecticut and Manhattan), comprising 119 theatres with 469 screens, from Paramount. The theatres were acquired by Cinamerica Theatres, L.P., a newly created limited partnership in which Warner and Gulf + Western, Paramount's parent, are co-equal partners.
 
 
 9
 Cinamerica's screens, located in 43 operating areas, constitute about two percent of the total number of screens in the country, approximately 22,000 in 1987. While Cinamerica owns more than half of the screens in nine cities and at least one-third in twelve additional markets, most of these markets are relatively small, except for the Westwood, California market, in which Cinamerica owns nine of the seventeen screens. This is noteworthy because Westwood and Manhattan's Upper East Side are considered in cinematic circles to be the two most important markets in the country due to the high concentrations of movie interests and personalities, as well as critics, in those areas; a successful first run in those two markets is generally believed to be a harbinger of nationwide success.[1] Warner, however, points out that the appearance of a high degree of market power in Westwood, as well as in Fairfield County, Connecticut, where Cinamerica also has a large number of screens, is deceptive because of the large numbers of competing screens located close to these areas, in Century City, California and Eastern Westchester County, New York, respectively.
 
 
 10
 Warner, pursuant to Part VI(B) of the Consent Decree, notified the Department of Justice of its proposed purchases in early 1987. The government conducted an investigation during 1987, concluding in December 1987 that it would not oppose Warner's acquisition of Cinamerica. In January 1988, Warner finalized the purchase and moved in the district court, pursuant to the August 1986 order, for approval of the transaction.
 
 
 11
 Warner's evidence consisted primarily of affidavits of Maurice Silverman, once the government attorney responsible for the enforcement of the various Paramount Pictures consent judgments, of William M. Landes, an economist, and of two Warner executives. The gist of the affidavits is that the market has changed in the forty years since Paramount Pictures so that the antitrust concerns then present do not exist today. Specifically, Warner's affiants argued that the industry has changed, largely due to the influence of the so-called "aftermarkets" of television and videocassettes, so that there is much less market concentration and many fewer barriers to entry. Warner argued that Cinamerica wields too little market power to enable Warner, should its motion be granted, to be able to restrain competition and drive out competitors. Warner also stressed that many independent distributors and exhibitors, including large independent national and regional exhibition circuits, have sprung up and flourished since the entry of the consent judgments and that these businesses are not in need of the court's protection. Deane Johnson, a Warner executive, asserted that "Warner wishes to be able to compete on an equal footing with its principal rivals," who are not subject to the decretal restrictions on vertical integration.
 
 
 12
 Landes, the economist retained by Warner, stated in his affidavit that the Herfindahl-Hirschman Index (HHI), a measure of market concentration adopted by the Antitrust Division in the 1984 Merger Guidelines, is now about 1100 in the movie distribution market, which indicates a "relatively unconcentrated market"; the district court relied upon a finding that the HHI in the exhibition market is under 200, indicating low market concentration.[2]
 
 
 13
 After a six-week notice and protest period, the district court heard arguments on Warner's motion on March 25, 1988. At the hearing, counsel for the Antitrust Division of the Department of Justice stated that the government, after having made "a complete competitive analysis of the acquisition," did not oppose the motion. Counsel argued in part that the existence of the aftermarkets has shifted much of the potential revenues from motion picture distribution away from theatres, making foreclosure of certain exhibition markets, which could hinder a distributor's access to the aftermarkets, undesirable and counterproductive.[3]
 
 
 14
 Judge Palmieri issued an opinion on December 12, 1988 in which he expressed dissatisfaction with the Department of Justice investigation and said that its acquiescence in Warner's acquisition was not supported by the record and that Warner had failed to carry its burden of demonstrating that the requested relief would not unreasonably restrain competition. 705 F.Supp. 878. Accordingly, the court ordered that Warner could retain its fifty percent stake in Cinamerica under the same terms and conditions set out in the interim order of August 27, 1986. These restrictions (1) require Warner to vest title to all of its exhibition assets in Cinamerica and to hold Cinamerica separate from Warner; (2) require the retention of the independence of Cinamerica's directors, officers and executives and subject their appointment and termination to review by the government; (3) prohibit Warner from directly or indirectly interfering in Cinamerica's management, operation and internal affairs; (4) order Warner to refrain from selling Cinamerica's assets except in the ordinary course of business and to maintain the commercial viability, as an ongoing business, of those assets; and (5) require Warner to deal at arm's length with Cinamerica. Judge Palmieri reiterated that nothing in the order relieves Paramount, Warner or Cinamerica from their respective obligations under the consent judgments and that Cinamerica must not license features other than on a theatre-by-theatre basis, and "solely upon the merits, without discrimination or favoritism among distributors, including Paramount or Warner." Finally, the order provides that Warner must, as ordered by the court from time to time, show cause why it should not be required to divest itself of any theatre holdings by demonstrating that its continued ownership of theatres does not unreasonably restrain competition in the distribution or exhibition of motion pictures.
 
 
 15
 Warner now appeals Judge Palmieri's order. The government joins Warner in arguing that there is no reasonable basis to conclude that Warner's acquisition of a one-half share and management rights in Cinamerica would threaten competition. In its brief, the government asserts that Warner has met its burden under the consent judgment by showing that its acquisition of a one-half interest in Cinamerica will not restrain competition. Pointing out that there is nothing inherently anticompetitive about a vertical merger, Fruehauf Corp. v. Federal Trade Commission, 603 F.2d 345, 351 (2d Cir.1979), the government maintains that the evolution of the motion picture industry since Paramount Pictures makes it improbable that Warner could or would endeavor to use its exhibition assets to stifle competition. The government concurs in Warner's suggestion that the court's order provide in part that "Cinamerica shall be free, without further order of [the] [c]ourt, to compete in theatrical exhibition through the construction of new theatres and the expansion or acquisition of theatres." Thus there is no opposition to Warner's appeal.
 
 II
 
 16
 The sole issue is whether Warner's acquisition of a fifty percent interest in Cinamerica is likely unreasonably to restrain competition in either the motion picture distribution or exhibition industries. This is the standard set forth in Part VI(B) of the consent decree and in Section 7 of the Clayton Act, 15 U.S.C. Sec. 18.
 
 
 17
 In order to protect the public interest the district court properly examined Warner's motion with great care, especially in light of the practices in the production, distribution and exhibition of motion pictures disclosed in the extensive litigation leading up to the 1948 Supreme Court decision in United States v. Paramount Pictures, Inc., supra, and the consent decrees which followed. Judge Palmieri cited United States v. American Cyanamid Co., 719 F.2d 558, 563-65 (2d Cir.1983), cert. denied, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984), a consent decree entered before trial, in support of his view that his inquiry regarding Warner's motion should be more vigorous because Warner and its co-defendants had entered into the consent decree after a trial which resulted in finding them guilty of antitrust violations. We believe that in view of the court's power to relax the provisions of its decrees in light of changing circumstances, we see no reason to make a distinction between consent decrees entered into before trial and consent decrees entered into after trial. United States v. Swift & Co., 286 U.S. 106, 114-15, 52 S.Ct. 460, 462-63, 76 L.Ed. 999 (1932); Railway Employees v. Wright, 364 U.S. 642, 650-51, 81 S.Ct. 368, 372-73, 5 L.Ed.2d 349 (1960); King-Seeley Thermos Co. v. Aladdin Indus. Inc., 418 F.2d 31, 34-35 (2d Cir.1969).
 
 
 18
 We conclude that Warner's one-half ownership interest in Cinamerica is not offensive under Part VI(B) of the consent judgment. The merger is unlikely to increase barriers to entry into the exhibition business or reduce competition by (1) foreclosing competing exhibitors from access to features; (2) foreclosing Warner's competitors from access to theatres; or (3) limiting entry and presence in the distribution and exhibition markets to integrated concerns. Fruehauf, supra, at 352 (citing Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).
 
 
 19
 There can be no question that Cinamerica, even with Warner behind it, will not be able to restrain competition among its competitors in the exhibition business. Cinamerica owns only two percent of the nation's screens, by any measure a low degree of concentration. In light of the continuing prohibition against licensing features to exhibitors on any basis other than theatre-by-theatre, we believe that Warner's stake, through Cinamerica, in motion picture exhibition is highly unlikely to result in foreclosure of the exhibition market.
 
 
 20
 The continuing injunction to license features theatre-by-theatre also makes it unlikely that Warner's interest in Cinamerica will result in foreclosure of distributors' access to exhibitors. Moreover, the changed nature of the motion picture exhibition industry has made such foreclosure highly improbable. The growth of the motion picture aftermarkets of videocassettes, network, syndicated and cable television, and the development of national television advertising, have changed the business realities of the industry so that movie producers and distributors have every incentive to disseminate their products as quickly, and as widely, as possible. Many more exhibitors exhibit on many more screens than was the case when the consent judgments were entered into. There is now at least one screen in most homes in the United States, many millions in addition to the 22,000 screens owned by motion picture exhibitors.
 
 
 21
 If the industry begins to show any signs of returning to the sort of licensing arrangements that were addressed and prohibited by the consent judgments, the Attorney General would be remiss if he did not seek to invoke the consent judgments to thwart such anticompetitive activities. Moreover, Warner's competitors remain free to seek redress under the antitrust laws if Warner begins to engage in anticompetitive activities. Consequently, the remote possibility that the anticompetitive practices eliminated by the consent judgment could be resumed is insufficient to compel the denial of Warner's motion.
 
 
 22
 The uncontroverted evidence presented to the district court is that Warner's motive for purchasing a stake in Cinamerica is to enable it to compete with distributors not subject to the decretal restrictions, a legitimate business purpose that offends neither the Warner Consent Judgment nor Section 7. See Brown Shoe Co., supra, at 329, 82 S.Ct. at 1526. The government agrees that Warner is highly unlikely to attempt any anticompetitive activity and argues that Warner's stated motive for the acquisition--improved ability to compete with distributors not subject to the decretal restrictions--is likely to be procompetitive rather than anticompetitive. As the district court noted, "with Warner and Paramount still dependent on their relationships with ... circuits [not owned by distributors], there is a convincing argument that it is not in Warner's interest to attempt foreclosure today."
 
 
 23
 Although Warner will be free, through its interest in Cinamerica, to add to its exhibition holdings in the future, the consent judgment is not affected in any other respect, and the injunction against licensing features to exhibitors in any manner other than on the merits, theatre-by-theatre, continues in full force and effect. Moreover, any further integration Warner may embark upon in the future will of course be governed by Section 7 and the full panoply of restrictions and regulations, such as the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. Sec. 18a, designed to subject proposed vertical mergers to careful scrutiny to ensure that any proposed integration will not unreasonably restrain competition in the motion picture industry.
 
 
 24
 Remanded, with directions to modify the order of the district court by eliminating any restrictions upon Warner's ownership and operation of its one-half interest in Cinamerica.
 
 
 
 [1]
 Cinamerica owns only one screen in New York City
 
 
 [2]
 Under the HHI, which is calculated by adding the squares of the individual market shares of all the firms in an industry, values of 1000 and 1800 are considered by the Justice Department to reflect moderate and high concentration, respectively. These numbers roughly correspond to the fifty percent and seventy percent concentration level benchmarks in the traditional "four-firm concentration" test, in which the shares of the four largest firms are simply added, the seventy percent mark indicating that the four largest firms in the relevant market control seventy percent of that market
 
 
 [3]
 There were two responses to the notice inviting comment. The National Association of Theatre Owners sent a letter saying that the acquisition may create "a potential for discrimination" but saw no reason to expect that any would actually result; it took no position on the acquisition. In addition, Paul Klieman, a theatre owner in Philadelphia, a market where Cinamerica has no theatres, accused Warner of violating the decrees and opposed the acquisition. Judge Palmieri's opinion makes no mention of these responses